Dorothy WELMAKER

v.

W. T. GRANT COMPANY.

Bessie ROSS

v.

W. T. GRANT COMPANY.

Mae Lizzie HACKNEY and Dorothy Welmaker, on behalf of themselves and all persons similarly situated

v.

W. T. GRANT COMPANY.

Betty G. JAMES

v.

W. T. GRANT COMPANY.

Civ. A. Nos. 15621, 15822, 15891 and 16101.

United States District Court,
N. D. Georgia,
Atlanta Division.

Decided Dec. 11, 1972.

On Motion for Certification Oct. 1, 1973.

Stack, O'Brien & Neely, Atlanta, Ga., for plaintiffs.

Brackett, Arnall & Stephens, Atlanta, Ga., Charles A. Doyle, New York City, for defendant.

SIDNEY O. SMITH, Jr., Chief Judge.

The question in these consolidated cases, brought as a class action, is whether the defendant has violated the Truth in Lending Act, 15 U.S.C. § 1601 et seq. (1970). At this juncture the Court must determine whether the plaintiffs

have shown a likelihood of success on their claims such that the notification of the proposed class is warranted. A protracted hearing, as supplemented by discovery and stipulations, was had for such purpose.

BACKGROUND.

The Plaintiffs assert seven violations of the Truth in Lending Act (hereinafter "the Act") all having to do with the credit aspects especially of the "coupon book" system of defendant, W. T. Grant Company (hereinafter "Grant's").[1] The offered by Grant's. Under the coupon book credit operation the customer obcoupon book is one of three credit plans tains a book of coupons which he may later exchange for merchandise at any Grant store. The coupons vary in denominations from 25 cents to $10.00 and the books vary in value from $20.00 to $200.-00. The coupons can be exchanged for merchandise at any time after purchase.

When a customer acquires his very first coupon book he is furnished with a credit disclosure form included within his installment sales contract. This contract designated as the "new and reopened contract," contains the terms of the transaction, the customer's repayment obligation and the credit disclosures. *See* Appendix A. The contract was revised in early 1971. Prior to the 1971 revision of the new and reopened contract, the customer's obligation to pay on the account accrued immediately upon execution of the contract. The payment included a sum for the principal amount of the coupon book and the finance charges, regardless of when or in what amount a coupon was exchanged for merchandise. The 1971 revised form for new and reopened contracts (hereinafter "new contract(s)") postpones the customer's payment obligation

until the first coupon has been exchanged for merchandise. *See* Appendix A (a blank of P #2). Therefore, the finance charge does not begin accruing until the first exchange for merchandise takes place. Thus, when a coupon of any denomination is exchanged (be it 25 cents or $10.00) the customer's obligation accrues for the full amount of his contract including full finance charges.[2]

If a debtor wishes to acquire additional coupon books before he has fully paid for any prior acquisitions he does so through the vehicle of a "add-on" retail installment sales contract. *See* Appendix B (P #1). The transaction is accomplished by rebating to the debtor a portion of the prior unearned finance charge, which rebated amount is determined from Defendant's Rebate or Discount Table Book. The prior balance is then reduced by the amount of the rebated finance charge. To this net amount is added the face value of the new coupon book (less any cash down payment) and any new insurance charges to arrive at the amount to be financed. The new finance charge is then calculated on the amount financed and added to that amount to arrive at the total new indebtedness. Any insurance premiums charged on the add-on contracts are determined by the amount of the new coupon book and not on the basis of total indebtedness. Upon execution of an add-on contract, the debtor is immediately obligated to pay the entire amount plus full finance charges, regardless of when the coupons are used or in what amount they are used. Neither the accrual of the finance charge nor repayment on the principal amount is deferred until a coupon has been exchanged for merchandise. In this sense, the add-on contracts are exactly like the pre-1971 new and reopened contracts.

---

1. Other claims were advanced at trial, but those have been abandoned. Moreover, the evidence on these claims, i.e. insurance commissions and lack of voluntariness in the original insurance coverage indicates no violations in such respects.

2. Thus, if a customer exchanges a $1.00 coupon for $1.00 in merchandise out of a $150.-00 coupon book his payments, which are due 30 days thereafter, are based on repayment of the entire $150.00, plus all finance charges calculated upon that amount and not solely upon the $1.00 exchange.

As indicated above, plaintiffs have alleged seven violations of the Act by defendant arising from the coupon book credit scheme. In the interest of clarity the Court will discuss each of the seven challenges in order below and will render the necessary findings of fact and conclusions of law applicable to a disposition of each. The above discussion should provide an adequate groundwork for that which follows.

### PLAINTIFFS' CHARGES.

1. *The Finance Charge Is Not Disclosed On the Add-On Disclosure Forms in Clear, Conspicuous and Meaningful Terms.*

This is the first alleged violation and concerns only the add-on form. *See* Appendix B. The purpose of the disclosure provisions of the Act is:

" . . . to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601 (1970).

In order to accomplish this "meaningful disclosure" the Act and Regulation Z require a creditor, prior to the extension of credit, to disclose to the debtor the sum of all charges, payable directly or indirectly by the creditor as an incident to or as a condition of the extension of credit. This sum is designated as the "Finance Charge." 15 U.S.C. § 1605; Regulation Z, § 226.4(a).

When a customer initially deals with Grant's coupon book credit plan he is presented the new contract wherein the finance charge is clearly displayed in the fourth column next to item 8 designated "Finance Charge" (in capitalized dark letters). *See* Appendix A. At the second encounter with Grant's, assuming he is indebted on an outstanding new contract, he is confronted with a different presentation vis-a-vis the finance charge. *See* Appendix B. The finance charge is still presented in dark letters (however not capitalized as in the new contract), but the finance charge is one of two figures located in the *third* column along with certain verbal descriptions. This is confusing in and of itself. What is perhaps most confusing is the fact that the finance charge is not made to appear as a separately stated item, but as an integral part of a formula that produces the figure in the fourth column. *See* Appendix B. That figure ($14.82) was termed by a defendant's witness on hearing as the "net finance charge"; it is actually the charge for adding the latest coupon book (in this instance $20.00) and extending the previous balance ($339.85) for another 24 months.

Regulation Z, § 226.6(c) authorizes the creditor, at its option, to make additional informational disclosures to the creditor. However, such additional disclosures may not "be stated, utilized, or placed so as to mislead or confuse the customer or contradict, obscure, or detract attention from the information required by this Part to be disclosed." Regulation Z, § 226.6(c). The Court finds that the positioning of the unlabeled "net finance charge" in relation to the required "finance charge" serves only to confuse the customer and clearly detracts attention from the required disclosure; the total finance charge. The resultant confusion and distraction defeats the purpose of the Act by diminishing, if not preventing, the consumer's conceptualization of what the *entire* transaction is costing him. He is left with no clear and unambiguous ground for comparison credit shopping.

2. *The Use of the Coupon Book Credit Scheme Results in an Understatement of the Annual Percentage Rate.*

The resolution of this second alleged violation is determined by the answer to the following question, to wit: Does the defendant extend credit to the customer from the time the coupon book is issued or from some later date when the coupons are exchanged for merchandise? The plaintiffs contend that for Truth in

Lending disclosure purposes the coupon book is no more than a credit device, a credit card, and that the extension of credit for which defendant imposes a finance charge occurs only when, and if, the coupons are actually exchanged for merchandise. The defendant contends that there is one sale and that occurs when the coupon book is purchased; the use of the coupons represents a series of exchanges, not a series of sales. At the sale defendant asserts the credit is extended.

The significance of the point in time when credit is extended is occasioned by the fact that as the period over which the credit is extended decreases (all other factors remaining constant), the annual percentage rate [3] increases proportionately; i. e. there is an inverse proportion between the annual percentage rate and the time over which credit is extended.

■ The Court is unpersuaded by plaintiffs' argument that when a coupon book is issued Grant's has parted with nothing of value and has not assumed any risk, credit or otherwise, to the purchaser. Upon coupon book issuance, Grant's has parted with the right to as yet undesignated merchandise in the total amount of the coupon book; the purchaser could immediately exchange the coupons for merchandise up to the amount indicated on the coupons—with no payment moving from the purchaser to Grant's. The Court can view such a transaction only as the extension of credit incident to a sale. Moreover, according to Ga.Code Ann. § 96–902(1) a sale of "goods" has occurred, to wit:

" 'Goods' means all personalty when purchased primarily for personal, family or household use, including certificates or *coupons issued by a retail seller exchangeable for personalty or*

---

*services. . . .* " § 902(1) of The Retail Installment and Home Solicitation Act.[4] (Emphasis added)

Therefore, the Court specifically rejects plaintiffs' contention that defendant has understated the annual percentage rate in the context of the circumstances discussed hereinabove.

3. *Defendants Have Failed to Disclose the "Unpaid Balance" in Violation of the Act.*

More precisely stated, plaintiffs third alleged violation should read: defendants have failed to use the term "unpaid balance" to describe the disclosure defendants now designate as "amount financed." It is clear to the Court that Regulation Z, § 226.8(c)(5) mandates the use of the term "unpaid balance" to describe what is required by 15 U.S.C. § 1638(a)(5). The defendant has failed to utilize the prescribed terminology and is therefore in violation of the Act.

■ ■ The defendant contends that the phrase "as applicable" found in 15 U.S.C. § 1638(a) "dispels any idea of rigid adherence to specific terminology." [5] The Court rejects this argument for the reasons stated by Judge Frankel in Ratner v. Chemical Bank of New York, 329 F.Supp. 270 (S.D.N.Y.1971). The defendant further asserts that Regulation Z, § 226.8(c)(5) is invalid because:

"A regulation which . . . operates to create a rule out of harmony with the statute, is a mere nullity." Manhattan Gen. Equip. Co. v. Commissioner of Internal Revenue, 297 U. S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936).

The Court however deems the regulation in question in harmony with the statutory scheme it was formulated to implement, amplify, and explain. Thus, the

---

3. The annual percentage rate is a function of (1) the amount financed (amount of sale and insurance charges), (2) the amount of finance charges, and (3) the period of time over which the finance charge accrues.

4. This characterization of coupons as "goods" is not unique to Georgia. Approxi-

mately 34 states have specifically provided for the inclusion of merchandise certificates or coupons in their retail installment sales act defined as "goods". These states include 6 states which have enacted the Uniform Commercial Code.

5. Brief for Defendant, p. 7.

regulation which prescribes specific terminology for the disclosure required by 15 U.S.C. § 1638(a)(5) is not invalid.[6]

### 4. The Non-Related Insurance Premium on all Add-On Contracts Constitutes an Additional Finance Charge Which Must be Disclosed as Such.

■ When a customer enters into a new contract with Grant's he is offered the opportunity to take out credit life insurance, health and accident insurance and property insurance. An election for insurance coverage is purely voluntary and is evidenced by the customer's signature on the contract within the "Insurance Agreement" blocked-off segment. See Appendix A and B. The insurance charges become part of the unpaid balance upon which the finance charge is computed. Under the circumstances, in the new contract when insurance is purely voluntary and meets the other requirements of Regulation Z, § 226.4(a)(5), insurance charges are not required to be disclosed as finance charges.[7] The problem arises only when the customer returns to Grant's and enters into an add-on contract.

■ It is the plaintiffs' contention that when the add-on contract is made a refinancing or renewal of the original (i. e. "new") contract is made. Defendant however asserts that "an add-on is no more than an increase in an existing obligation. . . . "[8] As will be seen below this distinction is a crucial one. The Court is persuaded that the extension of the time in which the outstanding balance on the new contract must be paid with a charge for that extension over-and-above the charge originally assessed can be deemed nothing other than a refinancing. Moreover, the testimony of James R. Crane, Regional Credit and Office Supervisor for the W. T. Grant Company in the Southern Region interpreting the form at Appendix B supports this conclusion, to wit:

"THE COURT: Now, she is buying $20 more and what is the finance charge on the new balance.

THE WITNESS: $62.50, based on the $313.59 total amount of what she owes. We had to *refinance*, we gave her back the unused money and now we are *refinancing* the entire new sale.

THE COURT: Is the $14.82 what it cost her to change contracts.

THE WITNESS: Yes, sir.

THE COURT: All right, then $21 and something, the finance charge on it is $14.82.

THE WITNESS: No, sir, the $14.82 is, also, to *refinance her previous balance* of $339 balance for another 24 months." (Emphasis added) (Tran-

---

**6.** Defendant asserts that the words "amount financed" is the suggested phraseology from the pamphlet "What You Ought to Know About Truth in Lending", promulgated by the Federal Reserve Board. This problem will be treated in a separate discussion with similar "reliance" problems hereinbelow.

**7.** Section 226.4—DETERMINATION OF FINANCE CHARGE.

(a) *General rule*. Except as otherwise provided in this section, the amount of the finance charge in connection with any transaction shall be determined as the sum of all charges, payable directly or indirectly by the customer, and imposed directly or indirectly by the creditor as an incident to or as a condition of the extension of credit, whether paid or payable by the customer, the seller, or any other person on behalf of the cus-

tomer to the creditor or to a third party, including any of the following types of charges:

\* \* \* \* \*

(5) Charges or premiums for credit life, accident, health, or loss of income insurance, written in connection with any credit transaction unless

(i) the insurance coverage is not required by the creditor and this fact is clearly and conspicuously disclosed in writing to the customer; and

(ii) any customer desiring such insurance coverage gives specific dated and separately signed affirmative written indication of such desire after receiving written disclosure to him of the cost of such insurance.

**8.** Reply Memorandum for Defendant, p. 7.

script of Proceedings on June 23, 1972, pp. 57–58.) [9]

Having established that the add-on contract transaction is a refinancing of the original debt the gravamen of plaintiffs' contention may be considered. Plaintiffs assert that any insurance on the original debt (new contract) terminates upon the refinancing of that primary obligation and the unearned insurance premium is supposed to be rebated to the customer. Defendant does not make such a rebate but continues to include the cost of the original insurance in the "amount financed"; i. e. unpaid balance.[10] The customer then either elects or declines insurance coverage only on the amount described in column two of the add-on contract next to item B(1): "Cash price (new sales)". *See* Appendix B. If the election for insurance is made as to that amount ($20 on Appendix B) the customer signs the Insurance Agreement on the face of the add-on contract. Nowhere does the customer elect or voluntarily consent to continued insurance coverage on that sum attributable to the original ("new") contract. If the customer declines insurance coverage he is still charged a fee involuntarily by virtue of Grant's retention of the insurance rebate they are contractually and legally required to grant.[11] Grant's therefore have failed to disclose "charges, payable directly or indirectly by the customers, and imposed directly or indirectly by the creditor as an incident to or as a condition of the extension of credit" in violation of Regulation Z, § 226.4(a). The defendant argues, unpersuasively in the face of the insurance certificate's and statute's language, that insurance coverage does in fact continue for the new term. Assuming *arguendo* that this were the case, then the premium charged for this extension constitutes part of the finance charge *unless* the insurance is voluntary and the customer executed an insurance authorization as contemplated by Regulation Z, § 226.4(a)(5). The non-rebated insurance premium, under Grant's argument, is automatically used to purchase the insurance for the new and extended term. While the practice gives the customer something for value, this does not comport with the concept of

---

9. See also the testimony of Robert J. Kelly on pages 134–137, Transcript of Proceedings on June 23, 1972, before the Court.

10. On the add-on contract, Appendix B, only the finance charge is rebated (item B) and no rebate is made of the unearned insurance premium.

11. The following appears on the Certificate of Insurance (Credit Life) provided the debtor, to wit:

"The insurance on the life of any Debtor shall immediately terminate on the earliest of the following dates: (a) the date of discharge of the Debtor's ·indebtedness, (b) the date the indebtedness is refinanced or renewed, (c) thirty days after the original scheduled maturity date of the indebtedness, (d) the date of foreclosure of the security or repossession of the article purchased, if any, (e) the date of termination of the Policy."

The following appears on the Certificate of Insurance (Injury and Sickness) provided the debtor, to wit:

"Subject to other provisions set forth herein, the insurance of any Debtor shall commence on the date he becomes indebted to the Creditor and shall immediately terminate on the earliest of the following dates: (a) the date of discharge of the Debtor's indebtedness, (b) the date the indebtedness is refinanced or renewed, (c) the original scheduled maturity date of indebtedness, (d) the date of foreclosure of the security or repossession of the article purchased, if any, (e) the date of termination of the policy."

Georgia Code Ann. § 56–3305 provides, in pertinent part:

56–3305. *Term of credit life insurance and credit accident and sickness insurance.* —The term of any credit life insurance or credit accident and sickness insurance shall, subject to acceptance by the insurer, commence on the date when the debtor becomes obligated to the creditor. . . . If the indebtedness is discharged due to renewal or refinancing prior to the scheduled maturity date, the insurance in force shall be terminated before any new insurance may be issued in connection with the renewed or refinanced indebtedness. In all cases of termination prior to schedule maturity, a refund shall be paid or credited as provided in section 56–3308.

voluntariness as envisioned by Regulation Z, § 226.4(a)(5).[12] Therefore, the defendant would be in violation of that section, even under their "continuing insurance" theory.

5. *The Disclosure to the Effect that Insurance Charges Will be Rebated When in Fact They are not Rebated is a Willful False Disclosure and a Violation of the Act.*

██ It is the plaintiffs' argument that the following language from defendant's "new" contract (*See* Appendix A) states that insurance charges will be rebated upon entry into an add-on contract; i. e. upon refinancing:

"NOTICE TO BUYER: . . . 3. You may prepay this contract at any time before final installment is due and receive rebate credit of unearned *finance charge* and charge(s) for insurance(s), if any, in accordance with sum of the digits methods." (Emphasis original)

The Court does not accept plaintiffs' argument that a refinancing is the same thing as prepayment; defining prepayment in the context of the above language. None of the plaintiffs in the matter *sub judice* have claimed to have *prepaid* the contract. The language which allegedly constitutes a willful false disclosure clearly indicates that a rebate of insurance premiums will be made upon prepayment. Plaintiffs' contention that such a disclosure is false is therefore without merit.

6. *Defendant's Charge for Property Insurance in Coupon Book Contracts is Partially a Finance Charge. Therefore, the Annual*

*Percentage Rate and the Finance Charge are Improperly Disclosed on all Such Transactions.*

██ Plaintiffs contend that that part of the charge for property insurance, assuming voluntary election by the customer, which is collected before the coupons have been exchanged for merchandise is not a bona fide insurance charge and must, therefore, be included in the finance charge. The Court finds that the facts do not support plaintiffs' conclusion. It has been established that under the "triggering device" incorporated in the new contracts the first payment is not due until 30 days after the first coupon is exchanged for merchandise. *See* Appendix B; the block of printing immediately under item 10. Therefore, until merchandise which the property insurance protects is in the hands of the customer the defendant has collected nothing; in fact, defendant collects nothing until 30 days thereafter. Moreover, the premiums for property insurance are not of such a magnitude that the value of the first coupon exchanged will not exceed in value that portion of the first payment allocated to the property insurance premium. Plaintiffs' contention that a proper disclosure as to property insurance has not been made is without merit.[13]

7. *The Insertion of Store No. 70 in the Blank Showing Seller's Place of Business is Misleading and is not a Sufficient Identification of the Seller to Comply with the Requirements of the Act.*

██ On all but one of the contract forms submitted to the Court by plaintiffs the defendant has filled in the

12. If the premium were rebated and insurance again requested (in required form) as to the carry-over balance in the add-on contract *then* the insurance would be voluntary.

13. The Court however finds a possible violation as to plaintiff James who entered into a pre-"triggering device" new contract with defendant. In that case plaintiff James was possibly paying for property insurance (al-

beit a small charge proportionately) before she had exchanged her first coupon for insurable property. While the coupons are deemed "goods" under Georgia Code § 96–902(1), the defendant offers replacement upon loss, theft, or destruction of the coupons if promptly notified. This replacement is in no way linked to any insurance coverage assumed by the purchaser.

blank entitled "seller's place of business" with the designation, "#70"; indicating store number 70.[14] *See* Appendix A and B. It is plaintiffs' position that such a disclosure is an inadequate attempt at compliance with Regulation Z, § 226.-8(a) which requires the creditor to be identified. The defendant counters and contends that its disclosure of "Seller: W. T. Grant Company, 441 Broadway, New York, N. Y. 10018" is sufficient. Plaintiffs assert that the Act requires meaningful disclosures and that to the average Georgia consumer, the disclosure of W. T. Grant in New York is a useless and non-meaningful disclosure.

The Court is convinced, as is apparently the defendant, that a customer should be apprised of the creditor's place of business. The Court deems "#70" in the blank where defendant's place of business should be indicated an unmeaningful disclosure. Basically, if the defendant is going to make such a disclosure, it should be a meaningful one not likely to confuse the customer—if anything, "#70" would serve only to confuse the customer. The Court is aware that on some of the contracts in the space next to "Payments due hereunder are to be made to the W. T. Grant Company at" the defendant has written "82 Whitehall St. S.W." However, this appears only on approximately half of the forms submitted to the Court, while "#70" appears in this space on the remainder. To avoid confusion the seller's place of business, in this instance 82 Whitehall St., S. W., Atlanta, Ga., should be fully and clearly set out in the appropriate place. Of all the violations of the Act this is perhaps the most "technical", inasmuch as all of the customers entered into the contracts at 82 Whitehall St. and knew personally of its location. However, given the spirit of the Act, any such violation is not without significance.

In summary, the Court's findings up to this point are as follows:

(1) The positioning of the unlabeled "net finance charge" in relation to the required "finance charge" on the add-on form is confusing and detracts from the required disclosure;

(2) the sale of the coupons by defendant is a sale of "goods" at which time defendant makes an extension of credit;

(3) the defendant has failed to use the term "unpaid balance" in violation of Regulation Z (said section of Regulation Z is not invalid);

(4) the non-rebated insurance premiums on all add-on contracts constitutes an additional finance charge which the defendant has failed to disclose;

(5) the defendant has not made a willfully false disclosure regarding the rebate of insurance charge upon prepayment of the contract (prepayment is not to be equated with refinancing);

(6) the defendant's charge for property insurance in coupon book contracts *after* the 1971 contract revision (initiating the "triggering device" scheme) is not a finance charge—but such a charge prior to the 1971 contract revision was a finance charge which should have been disclosed *if* the plaintiff [15] involved (James) did not exchange coupons for property before her first payment; and

(7) the insertion of "#70" and "store #70" in the blank labeled "Sellers place of business" is not a meaningful disclosure and serves to confuse the customer.

### THE "GOOD FAITH" DEFENSE.

In the instant case the Court has been impressed with defendant's extensive efforts to comply with the Truth in Lending Law.

 Prior to publication and receipt of the pamphlet entitled "What You Ought To Know About Truth In Lending" promulgated by the Federal Reserve Board (hereinafter "the Fed") de-

---

14. On plaintiff James' add-on contract the blank is filled in with "Store #70".

15. Plaintiff Ross is without the one year statute of limitations (15 U.S.C. § 1640(e) (1972 Supp.).

fendant specifically used the terminology "unpaid balance" on its contract forms. After perusing that pamphlet defendant, in obedience to the sample form found on page 22 designated as "Exhibit C" in the pamphlet, changed their terminology from "unpaid balance" to "amount financed." At the bottom of that form is found the following language:

"This form, when properly completed, will show how a creditor may comply with the disclosure requirements of the provisions of paragraphs (b) and (c) of § 226.8 of Regulation Z for the type of credit extended in this example."

The Court finds that only the terminology "unpaid balance" will fulfill the mandate of Regulation Z, § 226.8(c)(5), despite the above inconsistent notation at the bottom of page 22 of the pamphlet.

The testimony of defendant's Secretary and General Counsel, Robert J. Kelly, indicates that the defendant went to great lengths to achieve compliance with the Act. Kelly testified that as early as 1969 the President of Grant's at the annual stockholders meeting announced that the defendant had endeavored to be in substantial conformity with the Act prior to its effective date. Kelly testified that he had personally deleted the phrase "unpaid balance" from the defendant's 1968 contract form and replaced it with the terminology "amount financed" after receipt of the above-described pamphlet.

The defendant through Kelly consulted the Fed after receiving an inquiry from a New York state official as to the propriety of selling the coupon books in a "closed end transaction." The response from an attorney, Griffith L. Garwood, of the Fed's Division of Supervision and Regulation stated:

"Accordingly it is my opinion that your plan would not meet the tests of § 226.2(r) for open end credit and disclosures would have to be made under § 226.8. *Credit other than open end—specific disclosures.*" (Emphasis original) *See* Appendix C for letter in its entirety.

The Court deems the following testimony by Kelly as indicative of the efforts defendant made to comply with the Act, to wit:

"Q Prior to Truth in Lending, did you ever receive a request from the Federal Agency that the Grant Company produce copies of the various Credit Disclosure Forms for review.

A I believe it was in the Spring of 1967 that an attorney called at our New York Office from the Federal Trade Commission Office in New York and reviewed with me our coupon book operation and at the same time requested submission of a complete set of our contracts, Credit Contracts, not limited to New York, but the kind we use all over the United States, in other words, a whole set.

Q As a result of that review, did you furnish copies of the contracts to the FTC?

A Complete set of forms in use at that particular time were submitted to the Commission staff.

Q As a result of that review, did the FTC request any change in your disclosures?

A At that particular time there was no change in our disclosures.

Q Did you at any time receive a request from the Washington Office of the Federal Trade Commission for a copy of all Grant's Credit Disclosures after Truth in Lending?

A We did. I believe that request came in the spring of 1970 and at that time, we resubmitted all the forms in use at that time, to the Federal Trade Commission staff in Washington, to

Mr. Felman, who headed the office at that time.

Q Did you, about that time, go to Washington for a meeting with the Federal Trade Commission?

A We requested a meeting with the commission staff and I went to Washington with our credit director to review the whole coupon book situation with the staff members.

Q Do you recall who you met with at the Washington offices of the FTC?

A We met with Mr. Felman and Mr. Lou Frank.

Q What was the end result of that meeting?

A The end result of that meeting is fairly well reflected in, I believe, the first D–1 [16] Exhibit, which has now been introduced. The Grant Company voluntarily made five additional disclosure items in its revised form and we put those changes into effect at the request of the Commission as quickly as possible.

Q I show you copy of document marked D–9 [17] and ask that you compare that with the document marked D–7.[18] Does that enable you to explain to the Court what changes were made?

A It does. One change was one of exclusion. Prior to our trip to Washington that spring we had provided, in many of our installment sales contracts in conformity with the particular state we were operating in, we had provided for taking an acquisition charge in the event of prepayment. The commission staff said Grant do you in actual practice take an acquisi-tion charge on prepayment and our answer was, no. Well, they said in that event take it out; so we took out an acquisition charge which previously had appeared in our contract; but more substantial changes are reflected in the notice to the buyer. They are reflected in Items 5, 6 and 7.

Q In which exhibit?

A In Exhibit D–9.[19] They reflect the insertion of new material in the contract. The fifth one describes in detail what happens in the event a customer reports a coupon book is lost, destroyed, or stolen. The sixth item provides that if the amount owed, or the coupon is paid within 30 days of the date the coupons are first redeemed, no finance charge will be imposed. Although this appears for the first time in writing in the contract, this practice had been followed by stores for many years without any written disclosure.

Item 7 is merely an informative provision which advises the customer that we offer coupons in a wide range of denominations.

Probably the most significant change is reflected in the small print in the lower right hand corner of which I call the itemization, which sets forth what we refer to as the trigger device. We had explained to the commission that the company's records disclose that the average coupon book purchaser only buys coupons when they have an immediate purchase in mind, and our experience and tests have shown this over the years; but the commission took the example of someone who buys the book, doesn't use it for a long period and still makes monthly payments. We told

16. Letter dated May 6, 1970 from Kelly addressed to Sheldon Feldman, Esq., Acting Chief, Division of Consumer Credit, Federal Trade Commission, Bureau of Deceptive Practices, Washington, D. C. Appendix D.

17. The 1971 new and reopened contract form.

18. The 1969 add-on contract form.

19. The 1971 new and reopened contract form.

the commission this is not a matter-of-fact in terms of our experience, but we will put in a trigger device, and so as a result of our meeting with the commission, payment obligation doesn't begin to run until the first coupon is used." (Transcript of Proceedings on June 23, 1972, pp. 138–141.)

"Q Do you recall if at any subsequent time since 1970 the FTC has again requested copies of every Grant Credit Contract in use?

A We received a similar request in the spring of this year, I think it was, March and again went through resubmission procedure.

Q In other words, all the contract forms were resubmitted.

A Right.

Q And do you recall whether that request of 1972 also included a request for all rate charts?

A It included rate charts.

Q What about rebate charts?

A Rate charts, rebate charts, in other words, a complete submission of our working materials.

Q At any time during the review of the Grant Credit Contract Forms by the Federal Reserve Board in 1969, or by the Federal Trade Commission in 1967, 1970, 1972 have they ever advised you, or any representative of the Grant Company, to your knowledge, that the Grant Credit Forms were improper, or in violation of Truth in Lending because they did not include the word 'Unpaid Balance'?

A No, there was never a discussion of the absence of that term.

Q But the disclosure sections of the contract were completely discussed on each of those occasions?

A They were, we went through the whole business.

Q During any of those reviews, again by the FRB in '69, the FTC in '69, '70 and '72, has either of those agencies ever stated that the method used by the Grant Company to disclose finance charges in an add-on contract was in violation of Truth in Lending, or was misleading to the customer?

A This has never been a topic of discussion." (Transcript of proceedings on June 23, 1972, pp. 146–148.)

Having carefully considered the above testimony the Court is of the opinion that the defendant comes squarely within the bounds of 15 U.S.C. § 1640(c) which reads:

"(c) A creditor may not be held liable in any action brought under this section [ § 1640. Civil liability—Failure to disclose] for a violation of this part if the creditor shows by a preponderance of the evidence that *the violation was not intentional* and *resulted from bona fide error* notwithstanding the maintenance of procedures reasonably adapted to avoid such error." (Emphasis added)

The Court is persuaded that the defendant did not *intend to violate* the provisions of the Act in regard to the following: (1) use of the term "amount financed" rather than "unpaid balance", (2) the positioning of the unlabeled "net finance charge" in relation to the "finance charge", (3) the possible violation relating to property insurance charges in the pre-"triggering device" clause contract, and (4) the use of "# 70" and "store # 70" to indicate the seller's place of business;—and, further that said violations resulted from bona fide (i. e. good faith) errors notwithstanding the fact that defendant maintained reasonable procedures to avoid such errors. Were the Court to rule otherwise, given the circumstances in this case, a manifest injustice would be done. Moreover, as stated by the defendant:

"Otherwise banks, lending institutions, retailers, and others selling

goods on credit could no longer rely on such facts or even specifically promulgated formal opinions from the Federal Reserve Board as to whether disclosures must be made under open-end or closed-end type of credit transactions." Reply Memorandum for Defendant, p. 5.

■ The Court is fully cognizant of the conflicting construction of 15 U.S.C. § 1640(c) in the context of other facts by Judge Frankel in Ratner v. Chemical Bank New York Trust Co., 329 F.Supp. 270 (S.D.N.Y.1971) and later subscribed to by Judge Edenfield of this district in Buford v. American Finance Co., 333 F. Supp. 1243 (N.D.Ga.1971). This Court however respectfully disagrees with Judge Frankel's construction. The facts in both *Ratner* and *Buford* compel the conclusion that perhaps good faith was nonexistent even if good faith had been permitted as a defense. The New York court's analysis of "intentional" is in conflict with the express wording of the statute. In *Ratner* the court asserted:

"It is undisputed that defendant carefully, deliberately—intentionally —omitted the disclosure in question. That defendant, in this court's view, mistook the law does not make its action any less intentional. This is normally true in criminal cases." *Ratner*, supra 329 F.Supp. at 281.

The Court, however, is discussing the defendant's (therein) intention to do an act (i. e. omit a disclosure) which is a violation of the Act. 15 U.S.C. § 1640(c) specifically states that the *violation* not be intentional; i. e. that the defendant not intend to break the law. The "intentional" aspects of that exculpatory clause do not go to the acts or omissions of a defendant but rather to violations with which he is charged.

The Court is convinced that recourse to the legislative history of 15 U.S.C. § 1640 was unnecessary in view of the plain language of the statute. Further, as stated by the Supreme Court in Addison v. Holly Hill Co., 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488 (1943):

"While the judicial function in construing legislation is not a mechanical process from which judgment is excluded, it is nevertheless very different from the legislative function. Construction is not legislation and must avoid 'that retrospective expansion [or in the instant case, contraction] of meaning which properly deserves the stigma of judicial legislation'."

Moreover, as a general principle of statutory construction, when a particular construction will produce injustice, such a construction is to be avoided if another and more reasonable construction is perceived. See Knowlton v. Moore, 178 U.S. 41, 77, 20 S.Ct. 747, 44 L.Ed. 969 (1899). The Court has endeavored to reach such a result in finding a good faith defense in 15 U.S.C. § 1604 to any damage claims under the circumstances in the instant case.

It is difficult to imagine any more efforts to comply than those shown here. Prior approval of all forms and indeed duplication of the sample form recommended by the supervising governmental agency is the optimum any party can do in the exercise of good faith. Indeed if the good faith defense envisioned by the Congress is to have any meaning whatsoever, these efforts must suffice. To state simply that "every man is presumed to intend the consequences of his acts" and then to infer lack of good faith because an act is done gives no meaning to the phrase "resulted from bona-fide error" and cancels out the defense entirely. Section 1640(c) considers not only the act done, but the motive, state of mind, and intention to violate the law inherent in a determination of good faith.

■ However, the Court specifically finds in the matter *sub judice* that the defense of good faith is unavailable to the defendant as to the violation having

to do with failure of defendant to disclose as an additional finance charge the non-rebated insurance premiums on all add-on contracts. The defendant has argued that claims against such insurance coverage which is ostensibly paid for by the non-rebated premiums would be honored despite any legal duty to do so. However, given the explicit language of Ga.Code Ann. § 56–3305 and defendant's insurance forms, both of which affirmatively require rebate, the Court deems defendant's ignorance thereof unreasonable and hence, not in good faith.

### CONCLUSION.

A) The Court hereby enjoins the defendant from:

(1) using the terminology "amount financed" and orders it to comply with Regulation Z, § 226.8(c)(5) in such respect;

(2) positioning the unlabeled "net finance charge" in relation to the "finance charge" in such a manner that is misleading and confusing;

(3) using "# 70" and "store # 70" to describe defendant's place of business; and,

(4) not disclosing as a fee incident to the extension of credit the non-rebated original insurance premiums on add-on contracts.

B) The Court finds that damages will not be awarded relative to violations described in (1), (2), and (3) immediately hereinabove and as to the possible violation involving the collection of property insurance premiums before the plaintiff James' first exchange of coupons for merchandise; to these violations the defendant has a defense of good faith under 15 U.S.C. § 1640(c). The Court will also award a reasonable attorney's fee for the broad injunctive relief obtained upon a showing by plaintiffs' counsel of the time and expense involved in prosecuting this litigation.

C) In view of the overall evidence of "good faith" and the fact that no out-of-pocket loss is shown to any customer, the Court is constrained to the view that the interests of justice will not be served by awarding a potentially "horrendous" punishment against defendant. Allowing a recovery on the class claim regarding defendant's failure to disclose the fee resulting from the retention of non-rebated insurance premiums on add-on contracts could potentially produce such a punishment depending on its size. *See* Rogers v. Coburn Finance Corp. of De-Kalb, 54 F.R.D. 417 (N.D.Ga.1972); Ratner v. Chemical Bank New York Trust Co., 54 F.R.D. 412 (S.D.N.Y. 1972). However, should plaintiffs not be satisfied with the injunctive relief granted, the award of attorneys fees therefor, costs, and recoveries of $257.28 to plaintiff Welmaker [20] and $123.00 to plaintiff James,[21] they may proceed to develop further this class for recovery purposes as to the insurance premium non-rebate violation for further consideration by the Court.

D) In view of the Court's previous indications, the Court is required to entertain further evidence on the matter of defendant's good faith defense, but in view of the facts discussed hereinabove, a departure from the Court's present appraisal is unlikely.

The entry of any judgment herein is stayed pending response from counsel regarding those matters covered by paragraphs (B), (C), and (D) herein.

It is so ordered.

---

20. Plaintiff Welmaker entered into two add-on contracts where non-rebated insurance premiums went undisclosed. Twice the interest on the first is $132.28 (2 x $66.14), twice the interest on the second is $125.00 (2 x $62.50), for a total of $257.28. 15 U.S.C. § 1640(a)(1).

21. Plaintiff James entered into one add-on contract where non-rebated insurance premiums went undisclosed. Twice the interest is $123.00 (2 x $61.50). 15 U.S.C. § 1640(a)(1).

## APPENDIX A

*retail instalment sales contract–new and reopened*

GRANTS CREDIT PLAN

SELLER: W. T. GRANT COMPANY, 1441 BROADWAY
NEW YORK, N. Y. 10018

Seller's Place of Business _____

DATE

Buyer(s) _____
FULL NAME OF HUSBAND (IF MARRIED) WIFE'S FIRST NAME

Buyer's
Residence _____
NO. AND STREET OR ROAD AND ROUTE CITY STATE ZIP CODE

Employer _____ Weekly Income _____

NOTICE TO BUYER: 1. Do not sign this contract before you read it or if it contains any blank space. 2. You are entitled to a completely filled in copy of this contract. 3. You may prepay this contract at any time before final instalment is due and receive rebate credit of unearned finance charge and charge(s) for insurance(s), if any, in accordance with the sum of the digits methods. Where a rebate is less than $1, no rebate will be made. 4. You may at any time return unused coupons to the store where purchased and receive a full credit refund for the face amount thereof plus a complete finance charge refund on the unused coupons. A like adjustment is made on insurance charges, if any. 5. If a coupon book (unused or partially used) is lost, destroyed or stolen, the company will, on prompt notice of such mishap, replace the lost coupons or adjust the unpaid balance due by deducting therefrom the face value of the coupons missing and all finance charges thereon. Replacement or adjustment will usually be at the buyer's option; however, the seller may in its sole discretion insist upon account adjustment. 6. If the amount owed for the coupons is paid within 30 days of the date the coupons are first redeemed, no finance charge will be imposed. 7. A buyer has a choice of purchasing a coupon book in denominations of $20 to $200.

*To induce the W. T. Grant Company to make this sale, the buyer (herein called, whether one or more, the "buyer") represents that the information submitted in applying for this account is accurate and hereby buys from the seller and the seller sells the merchandise and/or merchandise coupon books listed below upon the following terms and conditions:*

| QUANTITY | DESCRIPTION OF GOODS OR SERVICES | PRICE | SERIAL NO. |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| | | | |
|---|---|---|---|
| 1. Cash price of goods | | 7. Amount financed (the sum of lines 5, 6[a] and [b]) | |
| 2. Cash down payment | | 8. FINANCE CHARGE | |
| 3. Unpaid balance of cash price (1 minus 2) | | 9. Deferred payment price (the sum of lines 1, 4, 6[a], [b] and 8) | |
| 4. Property insurance (if selected, based on 1) | | 10. Total of payments (7 plus 8) (Time balance) | |
| 5. Total of 3 plus 4 | | The Buyer agrees to pay to the Seller the "Total of Payments" shown above [10] in _____ equal monthly instalments of $_____ and one final instalment of _____ starting on _____ and all subsequent instalments on the same day of each consecutive month until paid in full. When a coupon book is purchased the payment obligation will be the same as set forth above except that the first payment date shall be 30 days from the date the coupons are first exchanged for specific merchandise. | |
| 6. Other insurance charges: [a] Credit life (if selected) | | | |
| [b] Accident & sickness (if selected) | | | |

Payments due hereunder are to be made to the W. T. Grant Company at _____
STORE ADDRESS

### ANNUAL PERCENTAGE RATE _____ %

*The buyer agrees to make payments in accordance with the above schedule and pursuant to these terms:*
*(1) The goods, whether affixed to realty or not, shall remain personal property and the seller retains title to and a purchase money security interest in the goods until the entire time balance therefor and any other indebtedness now or hereafter due hereunder by buyer to seller is paid. (2) Buyer agrees to keep goods in good order and repair; to pay all taxes assessed against goods and other liens, not to sell, lease, encumber or abandon the goods or remove them from buyer's residence and to assume the entire risk of loss, damage, or destruction of the goods. (3) If buyer fails to pay any instalment when due or breaches any provision hereof, or if any statement or representation given by buyer to seller with respect to this agreement be untrue or incomplete in any material respect, or if seller feels insecure for any reason, seller may accelerate the entire balance due without notice or demand and exercise all rights or remedies available under applicable law and this contract. (4) That whenever the payment of any instalment may be in default hereunder for at least 10 (ten) days the buyer shall pay to the seller a late charge of 5% of such instalment in default or $5.00, whichever is less. (5) That if seller refers this contract for collection to an attorney not a salaried employee of the seller, buyer agrees to pay in addition reasonable attorney's fees plus court costs. (6) Buyer waives homestead and exemption rights as against this obligation and appoints the seller attorney in fact to claim and collect the same. (7) Buyer, if over 21 and married represents having authority from spouse to sign this retail instalment sale agreement. This entire agreement to be effective only upon credit approval of W. T. Grant Company's Credit Department.*

CREDIT APPROVAL STAMP

**INSURANCE AGREEMENT**

The purchase of credit life insurance and accident and sickness insurance alone, property insurance alone, OR all 3 types of coverage, is voluntary and not required for credit. The cost of each type of insurance for the term of the contract is listed below and you may select the coverage you desire by checking the appropriate box and signing and inserting the date where indicated. If no box is checked and this insurance agreement is unsigned, no coverage will be provided. Print the name of the insured only when credit life and accident and sickness insurance is selected. Property insurance may be obtained by you through any person of your choice.

☐ I wish Property ......................... $ _____
☐ I wish Credit Life and Accident & Sickness $ _____
 TOTAL $ _____

The name of the insured is _____

Date _____ Signed X _____

ACCOUNT NUMBER

BUYER ACKNOWLEDGES RECEIPT OF AN EXECUTED COPY OF THIS RETAIL INSTALLMENT CONTRACT.

W. T. GRANT COMPANY X _____
 (Buyer)

By _____ _____
 (Co-Buyer)

GC-14 GA, (WTG 66151)
TL-4 1/71

## APPENDIX B

*retail instalment sales contract–add-on only*

**GRANTS CREDIT PLAN** SELLER: W. T. GRANT COMPANY, 1441 BROADWAY NEW YORK, N. Y. 10018

Seller & Store or Business

Buyer(s) *Mrs Charles Welmaker (Dorothy)* #70 4/10/71 DATE

Buyer's FULL NAME OF HUSBAND (IF MARRIED) WIFE'S FIRST NAME

Residence *1214 Washington Cir. Atlanta* #13 30344
NO. AND STREET OR ROAD AND ROUTE CITY STATE ZIP CODE

Employer *Meadows Inds.* Weekly Income

NOTICE TO BUYER: 1. Do not sign this contract before you read it or if it contains any blank space. 2. You are entitled to a completely filled in copy of this contract. 3. You may prepay this contract at any time before final instalment is due and receive rebate credit of unearned finance charge and charge(s) for insurance(s), if any, in accordance with sum of the digits methods. Where a rebate is less than a $1, no rebate will be made. 4. You may at any time return unused coupons to the store where purchased and receive a full credit refund for the face amount thereof plus a complete finance charge refund on the unused coupons. A like adjustment is made on insurance charges, if any. 5. If a coupon book (unused or partially used) is lost, destroyed or stolen, the company will, on prompt notice of such mishap, replace the lost coupons or adjust the unpaid balance due by deducting therefrom the face value of the coupons missing and all finance charges thereon. Replacement or adjustment will usually be at the buyer's option; however, the seller may in its sole discretion insist upon account adjustment. 6. if the amount owed for the coupons is paid within 30 days of the date the coupons are first redeemed, no finance charge will be imposed. 7. A buyer has a choice of purchasing a coupon book in denominations of $20 to $200.

*To induce the W. T. Grant Company to make this sale, the buyer (herein called, whether one or more, the "buyer") represents that the information submitted in applying for this account is accurate and hereby buys from the seller and the seller sells the merchandise and/or merchandise coupon books listed below upon the following terms and conditions:*

| QUANTITY | DESCRIPTION OF GOODS OR SERVICES | PRICE | SERIAL NO. |
|---|---|---|---|
| 1 | Coupon Book | 20.00 | C 588458 |

| | | | | | |
|---|---|---|---|---|---|
| A. Prior balance due before rebate of FINANCE CHARGE | 33985 | 7. Amount financed (the sum of lines B, 5, 6(a) and 6(b) | 3 13 59 | |
| B. Prior balance due after rebate of FINANCE CHARGE | 292.17 | 8. (a) Finance charge $ 62 50 (b) Less rebate $ 47 68 equals | 14 82 | |
| 1. Cash price (new sales) | 20.00 | 9. Deferred payment price (the sum of lines B, 1, 4, 6(a), 6(b) and 8(a) | 376.09 | |
| 2. Cash down payment | — | 10. Net add-on (the sum of lines 5, 6(a), 6(b) and 8 | 36 24 | |
| 3. Unpaid balance of cash price (1 minus 2) | 20 00 | 11. Total payments (the sum of lines 7 and 8 (a)) | 376.09 | |
| 4. Property insurance (if selected, based on 1) | 65 | | | |
| 5. Total of 3 plus 4 | 20 65 | | | |
| 6. Other insurance charge: (a) Credit life insurance (if selected) | 09 | | | |
| (b) Accident and sickness insurance (if selected) | 68 | | | |

The Buyer agrees to pay to the Seller the "Total of Payments" shown above (11) in 25 equal installments of $ 15 00 and one final installment of $ 1.09 starting on 5-10-71 and all subsequent installments on the same day of each consecutive month until paid in full.

Payments due hereunder are to be made to the W. T. Grant Company at *82 White Hall St. S.W.*
STORE ADDRESS

### ANNUAL PERCENTAGE RATE 17.6 %

*The buyer agrees to make payments in accordance with the above schedule and pursuant to these terms:*
*(1) The goods, whether affixed to realty or not, shall remain personal property and the seller retains title to and a purchase money security interest in the goods until the entire time balance therefor and any other indebtedness now or hereafter due hereunder by buyer to seller is paid. (2) Buyer agrees to keep goods in good order and repair; to pay all taxes assessed against goods and other liens, not to sell, lease, encumber or abandon the goods or remove them from buyer's residence and to assume the entire risk of loss, damage, or destruction of the goods. (3) If buyer fails to pay any instalment when due or breaches any provision hereof, or if any statement or representation given by buyer to seller with respect to this agreement be untrue or incomplete in any material respect, or if seller feels insecure for any reason, seller may accelerate the entire balance due without notice or demand and exercise all rights or remedies available under applicable law and this contract. (4) That whenever the payment of any instalment may be in default hereunder for at least 10 (ten) days the buyer shall pay to the seller a late charge of 5% of such instalment in default or $5.00, whichever is less. (5) That if seller refers this contract for collection to an attorney not a salaried employee of the seller, buyer agrees to pay in addition reasonable attorney's fees plus court costs. (6) Buyer waives homestead and exemption rights as against this obligation and appoints the seller attorney in fact to claim and collect the same. (7) Buyer, if over 21 and married represents having authority from spouse to sign this retail instalment sale agreement.*
*This entire agreement to be effective only upon credit approval of W. T. Grant Company's Credit Department.*

CREDIT APPROVAL STAMP

#### INSURANCE AGREEMENT

The purchase of credit life insurance and accident and sickness insurance alone, property insurance alone, OR all 3 types of coverage, is voluntary and not required for credit. The cost of each type of insurance for the term of the contract is listed below and you may select the coverage you desire by checking the appropriate box and signing and inserting the date where indicated. If no box is checked and this insurance agreement is unsigned, no coverage will be provided. Print the name of the insured only when credit life and accident and sickness insurance is selected. Property insurance may be obtained by you through any person of your choice.

☑ I wish Property .......... ... .. ... ... ... ... $ 65
☑ I wish Credit Life and Accident & Sickness $ 77

TOTAL $ 1 42

The name of the insured is *Dorothy Welmaker*

Date *4/10/71* Signed X *Dorothy Welmaker*

BUYER ACKNOWLEDGES RECEIPT OF AN EXECUTED COPY OF THIS RETAIL INSTALLMENT CONTRACT.

W. T. GRANT COMPANY X *Dorothy Welmaker*
(Buyer)

By *T. Benton*

(Co-Buyer)

ACCOUNT NUMBER

P-1 Admitted
CA 15621, 15622, 15891, 16101
6-23-72

P 1887 6/1/72

## APPENDIX C

### FTC Coupon File

**BOARD OF GOVERNORS**

OF THE

**FEDERAL RESERVE SYSTEM**

WASHINGTON, D. C. 20551

DIVISION OF SUPERVISION
AND REGULATION

RECEIVED

JUL 2 1969 July 1, 1969.

LAW DEPARTMENT

Mr. Robert J. Kelly,
W. T. Grant Company,
Fourteen Forty-One Broadway,
New York, New York. 10018

Dear Mr. Kelly:

This is in reference to your letter of May 20, 1969, inquiring whether Grant's instalment credit coupon book plan falls within open end credit as defined in § 226.2(r).

It is my understanding that under the plan a customer purchases a book of credit coupons for a total set amount, for example $50. The purchase obligates the customer to repay the $50 plus precomputed interest over a predetermined repayment period in instalments. While the customer is immediately entitled to use the credit coupons to purchase merchandise, whether he does so or not is immaterial with regard to his obligation to repay. Neither the period of repayment, instalment amounts, or payment dates are determined by the customer's actual use of the coupons. It would in fact be possible for him to have fully repaid the obligation and not have used any coupons.

While this type of plan would satisfy the first requirement for open end credit, that is, that the customer is permitted to make purchases from time to time, your plan does not contemplate the existence of an account under which there will be repetitive transactions on a revolving basis (see interpretation § 226.203). Furthermore, it does not meet the crucial third criteria under § 226.2(r) that "a finance charge may be computed by the creditor from time to time on an outstanding unpaid balance."

Accordingly it is my opinion that your plan would not meet the tests of § 226.2(r) for open end credit and disclosures would have to be made under § 226.8 Credit other than open end--specific disclosures.

Very truly yours,

Griffith L. Garwood,
Attorney.

APPENDIX D

CERTIFIED MAIL
R. R. R.

May 6, 1970

Sheldon Feldman, Esq.
Acting Chief, Division of
Consumer Credit
Federal Trade Commission
Bureau of Deceptive Practices
Washington, D. C. 20580

Re: Your File No. 682 348:

Dear Mr. Feldman:

Since our meeting with you and Mr. Franke on April 20 we have had the opportunity of thoroughly reviewing with our management the matters discussed. This letter reflects the position of our management. We request that you submit it to the Commission for its consideration and we include, by reference, our letter of May 14, 1969, addressed to Mrs. Mulhern of the New York Field Office which is part of your file. By doing this we hope to keep this letter reasonably short and to avoid needless repetition. At the same time it will provide a further opportunity to correct any misconceptions which may still exist regarding the usage and operation of our coupon book plan.

At the outset let it be clear that the Grant Company does not consider that the operation of its present coupon book plan is unfair in any way within the meaning and interpretation of Section 5 of the Federal Trade Commission Act or by the application of any more demanding ethical standard of business practice.

Since 1946 this plan has been in use in every Grant store in the United States. It has always enjoyed widespread acceptance and popularity with hundreds of thousands of customers in all parts of the United States and has been productive of relatively few complaints over the years. For many sound reasons this acceptance is well deserved. It affords the customer a great convenience in handling small transactions by eliminating the need for a sales slip for each trans-action. It allows the customer to budget her spending; to know exactly how much she has spent and has left to spend, and to know precisely what her monthly payment would be. She also has the satisfaction of knowing that regardless of the location of the store where her coupon book is purchased, she has the privilege of using it in any Grant store in the United States. These particular features have proven especially attractive to a large percentage of Grant's average customers. To keep the record straight, however, it should also be noted that Grant offers to its customers a "big ticket" closed-end installment purchase plan, and also the familiar open-end revolving charge plan.

Specific legislative authorization of coupon books and merchandise certificates is found in the retail installment sales acts of twenty-five states at present. In these states and in fact in all states there have been no legal proceedings initiated by any state agency to bar their use. It is also pertinent to note that the National Conference of Commissioners on Uniform State Laws has made provision for the inclusion of merchandise certificates and coupons in its revised final draft of the Uniform Consumer Credit Code.

This record of continuous customer acceptance for twenty-four years combined with specific statutory approval in many states and tacit and implied approval in the others, evidences, in our opinion, a broad recognition that the coupon book plan is fair and equitable. Were it otherwise, we are certain that our customers would have long since rejected it and that state agencies would also have moved promptly against it.

During our April 20 meeting you pointed out that the focal point of the Commission's objections to the plan was the fact that the finance charge is imposed at the time the contract is signed and payments may begin before the coupons are exchanged for specific merchandise. In rebuttal we pointed out that the Company's experience is that 94% of the dollar value of all coupons sold is re-

deemed within sixty days after purchase. This fact lends support to our conviction based on long experience, that customers generally do not contract to purchase coupon books unless immediate purchases are in mind.

Another vital fact pertinent to this issue which more often than not is overlooked is that a coupon book customer always has the right at any time to return unused coupons to the store where purchased and receive a full credit for the face amount of the coupons returned, plus a pro rata (complete) refund of the credit service charge on the unused coupons as of the date of issuance of the coupons. This absolute right to return unused coupons has always been acknowledged by Grant despite the fact it is provided for only in the Retail Installment Sales Act of New York and not in the other twenty-four states. Its significance cannot be ignored. It permits a customer who may have overestimated her needs for coupons or who abruptly changes her plans regarding their use, to return them at any time and thus avoid any charge whatever on the unused coupons. In our considered judgment it eliminates any possibility of unfairness.

Finally, at our meeting we pointed out that the legal basis for coupons as set forth in the retail installment sales acts of all those states which specifically cover coupons, is to treat the coupons themselves as "goods". Hence, the subsequent use of coupons for specific merchandise represents a series of exchanges and is not considered a series of sales. The importance of this distinction is great in upholding their sale under the time price theory. It is also relevant in considering the Commission's objection regarding the imposition of the finance charge.

For the reasons set forth above the Grant Company believes that the objection of the Commission to the imposition of finance charges before the coupons are actually used, is unwarranted when considered with all the facts. More specifically, it is a certainty that the administrative cost and complexity in setting up a coupon book system or a gift certificate system whereby the buyer or donor, as the case may be, is charged only at such time as individual coupons or certificates are exchanged for specific merchandise, would be prohibitive to any retailer. It is submitted that the legislators and legislative draftsmen of these retail installment sales acts which specifically cover coupons and merchandise certificates clearly foresaw and understood the practical impossibility of setting up special procedures regarding application of finance charges for this type of credit transaction. They overcame and resolved the problem by legally defining coupons and merchandise certificates as "goods" and by providing that all "goods" whether tangibles or coupons, are treated in the same manner in all major respects, including the imposition of finance charges.

While the Grant Company has indicated in this letter its position regarding the primary objection of the Commission to the plan, it is, nevertheless, desirous of responding to the Commission's objection to whatever extent possible to try to satisfactorily eliminate the objection. The Company is also prepared to provide additional disclosures. With this in mind and without prejudice the Company is ready to initiate the changes set forth below. Should they be acceptable to the Commission they will be introduced as rapidly as possible.

1. Set up an appropriate system whereby on the installment sale of a coupon book under a closed-end new or reopened account the payments and other computations will not become effective until the first actual exchange of coupons for specific merchandise.

2. Delete all reference to acquisition charges now appearing in some contract forms at the next regular printing of each form.

3. Include in our contract forms an affirmative statement to the effect that if a coupon book (unused or partially used) is lost, destroyed or stolen, the Company will, on prompt notice of such

a mishap, adjust the unpaid balance due under the contract by deducting therefrom the face value of the coupons missing and all finance charges thereon. This is not a new policy, but merely re-emphasis of an existing one.

We wish to make it clear that the Company sincerely believes that the changes proposed effectively meet the Commission's objections. Again we thank you for your patient review of our plant at the April 20 meeting, and also for your obvious interest and concern in determining the facts about it.

Very truly yours,

Robert J. Kelly

RJK:MLA
cc Lewis Franke, Esq.
bcc Messrs. Mayer
 Curtin
 Zimmerman
 Lorenzo

*On Motion for Certification of the Class Plaintiff*

 Plaintiffs have moved for certification of the class plaintiff in this Truth-in-Lending Act suit, the necessary extensive discovery having been completed. In the initial stages of the instant case counsel for the respective parties acquiesced, due to the then largely indefinite and undetermined character of the class, to proceed to a hearing on the merits of plaintiffs' claims with regard to alleged violations of the Truth-in-Lending Act (hereinafter "the Act").[1] It was thought that such a hearing would serve to ascertain any specific violations thereby necessarily limiting and defining the class involved and obviating the need for costly "blanket" notice and discovery. Having defined the class through this procedure,[2] the court would then be in a position to judge whether the class thus defined was within or without the provisions of F.R.Civ.P. 23. The court rendered a lengthy and comprehensive opinion on December 8, 1972, based upon stipulations, discovery, and a protracted hearing held on June 23, 1972. The court announced in that opinion that the defendant had violated the provisions of the Act by: (1) using the terminology "amount financed" thereby failing to comply with § 226.-8(c)(5) of Regulation Z; (2) positioning the unlabeled "net finance charge" in relation to the "finance charge" in such a manner that it is misleading and confusing; (3) using "#70" and "store #70" to describe defendant's place of business; and, (4) not disclosing as a fee incident to the extension of credit the non-rebated original insurance premiums on add-on contracts. These violations occurred in connection with defendant's "coupon book" system of credit. The court permanently enjoined the defendant from continuing to violate the provisions of the Act in the manner described.[3]

---

1. In Huff v. N. D. Cass Co. of Alabama, 468 F.2d 172 (1972) the Fifth Circuit recognized and approved such a hearing-on-the-merits procedure to aid the district court in its resolution of the issue as to whether the suit should be allowed to proceed as a class action under F.R.Civ.P. 23. As Judge Lawrence indicated in Baxter v. Savannah Sugar Refining Corp., 46 F.R.D. 56, 60 (S.D.Ga. 1968):
 "Allegations in the complaint do not necessarily determine the extent of the class. Any trial lawyer knows that asseveration and fact are sometimes complete strangers. Generally, the specification of class membership should be made by a court with factual background before it than just the complaint itself affords."

2. In order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable. *See* DeBremaecker v. Short, 433 F.2d 733 (5th Cir. 1970); Hamer v. Campbell, 358 F.2d 215 (5th Cir. 1966); Weisman v. MCA Inc., 45 F.R.D. 258 (D.Del.1968); Hardy v. United States Steel Corp., 289 F.Supp. 200 (N.D.Ala.1967); 3A Moore's Federal Practice ¶ 23.04 (2d ed. 1969). *See also* Quevedo v. Collins, 414 F.2d 796 (5th Cir. 1969). *Cf.* Gillibeau v. City of Richmond, 417 F.2d 426 (9th Cir. 1969).

3. In the court's order of January 17, 1973, the entry of formal injunctive relief was stayed pending a further ruling by the court.

As to the matter of damages under 15 U.S.C. § 1640 the court determined that the defendant had a defense of good faith under 15 U.S.C. § 1640(c) as to the first three violations described hereinabove. The court calculated the damages recoverable by the individual plaintiffs James and Welmaker as a result of its disallowance of the good faith defense to the fourth violation regarding the defendant's failure to disclose the fee resulting from the retention of nonrebated insurance premiums on add-on contracts. The court noted at that juncture its inclination not to award a "horrendous" penalty against the defendant which might be occasioned by allowance of the suit to proceed as a class action. However, the size of the class and the resultant damages could only be ascertained through further discovery.

On January 17, 1973, "in order to determine the members of the class plaintiff", the court ordered, upon agreement by counsel, that the plaintiffs select an independent auditor to determine the names, addresses, and account numbers of those customers of defendant's store No. 70 located at 82 Whitehall Street, Atlanta, Georgia, involved in add-on contracts to whom the defendant had failed to rebate a prior insurance charge.[4] In addition to the customers' names, addresses and account numbers the auditor was to determine the amount of the finance charge involved in each such add-on contract. Subsequent to the January 17, 1973, order, but prior to the completion of discovery directed in that order, the court considered and rejected plaintiffs' motion for reconsideration of the good faith issue resolved by the court in the December 8, 1972, opinion.

Pursuant to the order of January 17, 1973, the discovery was completed by the accounting firm of Touche Ross & Co. whereupon plaintiffs moved the court to certify the plaintiff class members, to certify this consolidated action as a proper class action, and to direct that notice be prepared by the parties for delivery pursuant to F.R.Civ.P. 23(c). The defendant opposes the certification of this action as a proper class action for failure to come within the requirements of F.R.Civ.P. 23.

## THE CLASS ACTION ASPECT

The discovery report submitted by Touche Ross & Co.[5] demonstrates that the plaintiff class, limited as noted above to defendant's store No. 70, would be comprised of approximately 2,800 members involved in some 4,870 transactions with a total dollar amount of finance charges in excess of $400,000. Plaintiffs predict, based upon these figures, that class damages in this case will be roughly twice the $400,000 in finance charges; that is, something in excess of $800,000.

Before a class action may be maintained under F.R.Civ.P. 23 plaintiffs must first come within the ambit of section "a" of the Rule. F.R.Civ.P. 23(a) provides:

"(a) One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

4. Both counsel for plaintiffs and defendant agreed that for the purposes of this suit the class would be restricted to a single store in the hope of maintaining manageability. *See* Plaintiffs' Supplemental Brief In Support of Certification of the Class, p. 2, lines 3–6.

5. The defendant bore the $30,000 cost of the discovery audit. However, it is interesting to note that through the audit defendant was apprised of the fact that it had paid to its customers in over-rebates a sum exceeding $300,000. Thus, the discovery audit may be worth its cost to defendant from a managerial standpoint.

In the instant consolidated case the court is persuaded that the plaintiffs have met the requirements set forth in F.R.Civ.P. 23(a). However, once the requirements of F.R.Civ.P. 23(a) have been met, at least one of the requirements set forth in F.R.Civ.P. 23(b) must also be met. F.R.Civ.P. 23(b) provides:

"(b) An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, *and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.* The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the contro versy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action." (Emphasis added.)

Subparts (A) through (D) of F.R.Civ.P. 23(b)(3) are only suggestive, not exhaustive of the factors that should be considered in deciding whether to allow a F.R.Civ.P. 23 class action. Shields v. First National Bank of Arizona, 56 F. R.D. 442 (D.Ariz.1972); Wilcox v. Commerce Bank, 55 F.R.D. 134 (D.Kan. 1972); Buford v. American Finance Co., 333 F.Supp. 1243 (N.D.Ga.1971); Proposed Amendments to the Rules of Civil Procedure, Advisory Committee's Notes, 39 F.R.D. 69, 104 (1966). *See* Rogers v. Coburn Finance Corp. of DeKalb, 54 F. R.D. 417 (N.D.Ga.1972); Ratner v. Chemical Bank New York Trust Co., 54 F.R.D. 412 (S.D.N.Y.1972). Moreover, since consideration of whether a class action is "superior to" other available methods for resolution of this controversy will be dispositive, the court will focus on that requirement.

The traditional purpose of a class action is to generate incentive to litigate claims that would otherwise not be litigated because they are so small as to make it impractical to bring individual suits. *See* Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir.1968); Shields v. First National Bank of Arizona, 56 F.R.D. 442 (D.Ariz.1972); Wilcox v. Commerce Bank, 55 F.R.D. 134 (D.Kan. 1972); C. Wright, Handbook on the Law of Federal Courts, § 72 (2d ed. 1970). However, the Truth-in-Lending Act is drafted so that the incentive offered by a class action is not necessary to enforce the provisions of the Act. Section 1640(a) provides that an individual plaintiff will recover a minimum of $100 plus attorneys fees and costs. It is therefore manifest that the Act contemplates that the damages involved in the violations of the Act will often be under $100 and that the attorney's fee should not be measured as a percentage

of the total judgment. Thus by inserting 15 U.S.C. § 1640(a) into the Act, Congress removed one of the principal reasons why a class action would be superior to individual suits; that is, each individual member of the proposed class has an adequate remedy by means other than a class action. Moreover, the injunctive relief secured as a corollary to the individual plaintiff's damage suit serves to protect a large body of as yet undetermined consumers thereby obviating the necessity for class action injunctive relief. The recent cases which held a class action to be inferior to other methods of disposition reason that the "broad and open-ended terms" of F.R. Civ.P.23 "call for the exercise of some considerable discretion of a pragmatic nature" and emphasize that the allowance of a class action in such cases is essentially inconsistent with the specific remedy supplied by the Act. *See* Shields v. First National Bank of Arizona, 56 F.R.D. 442 (D.Ariz.1972); Wilcox v. Commerce Bank, 55 F.R.D. 134 (D.Kan.1972); Rogers v. Coburn Finance Corp. of DeKalb, 54 F.R.D. 417 (N.D.Ga.1972); Ratner v. Chemical Bank New York Trust Co., 54 F.R.D. 412 (S.D.N.Y.1972).

Plaintiff argues, however, that a large corporation like the defendant corporation would not be compelled to comply with the terms of the Act if the court denies the maintenance of this suit and similar suits as a class action. The potential recovery in the instant case, something in excess of $800,000 as noted above, would certainly prove to be a powerful deterrent to violations of the Act. However the court is constrained to the view expressed in Wilcox v. Commerce Bank, 55 F.R.D. 134, 138 (D.Kan. 1972) quoting Report and Recommendations of the Special Committee on Rule 23 of the Federal Rules of Civil Procedure, American College of Trial Lawyers (March 15, 1972), at 5–6:

"The cost of judicial time and consequent impairment of rights of other litigants appears too high a price to pay for deterrence which can be effected through alternative means."

Moreover, the court deems the deterrent effect of the mandatory statutory minimum $100 damage provision when coupled with the "private attorney general" concept embodied in 15 U.S.C. § 1640(a) ample to protect the individual members of the proposed class.[6]

In the instant case the proposed class is composed of approximately 2,800 individuals involved in some 4,870 transactions with a total dollar amount of finance charges in excess of $400,000. Damages are forecast to be something in excess of $800,000. The court is persuaded that the highly technical violation of the Act by the defendant does not warrant the imposition of "a horrendous punishment" in the instant case. Assessing damages in excess of $800,000 would be particularly inappropriate where, as in this case, there has been no substantial individual financial loss flowing to members of the proposed class.

Persuaded by the reasoning in the *Shields, Wilcox, Rogers, Ratner,* and *Buford* cases and based upon the facts and circumstances of the instant case when viewed against the backdrop of the class action rule, the court is constrained to the view that plaintiffs' motion to designate this action as a class action must be denied.

The court awards the plaintiffs' attorneys in the instant case the sum of $17,500.00 as a reasonable attorney's fee pursuant to 15 U.S.C. § 1640(a)(2). While this fee would be disproportionate for the awards made to the individual claimants, this amount reflects the court's consideration of the significant and far-reaching effects of the injunctive relief for future consumers gained by the attorneys in their efforts on be-

6. Between January 1, 1973 and June 30, 1973 there were 178 Truth-in-Lending Act suits commenced in the Atlanta division of this district. It is therefore apparent to the court that action under the provisions of the Act is a viable and greatly utilized individual remedy.

half of the plaintiffs. The costs in the instant matter (all cases consolidated for disposition herein) are assessed against the defendant herein pursuant to 15 U.S.C. § 1640(a)(2). The Clerk is also instructed to enter judgment in the following amounts in favor of the individual plaintiffs as indicated:

Dorothy Welmaker $ 257.28
Betty G. James $ 123.00

The court hereby enjoins the defendant from:

(1) using the terminology "amount financed" and orders it to comply with Regulation Z, § 226.8(c)(5) in such respect;

(2) positioning the unlabeled "net finance charge" in relation to the "finance charge" in such a manner that is misleading and confusing;

(3) using "#70" and "store #70" to describe defendant's place of business; and,

(4) not disclosing as a fee incident to the extension of credit the non-rebated original insurance premiums on add-on contracts.

It is so ordered.