Mary BUFORD
v.
AMERICAN FINANCE COMPANY.

Daisy LEMONS et al.
v.
WELCOME FINANCE COMPANY.

Daisy LEMONS et al.
v.
JACKSON LOAN COMPANY.

Daisy LEMONS
v.
CITY FINANCE CORP.

Daisy LEMONS
v.
ACME INVESTMENT CO.

Evelyn KINSEY
v.
TIME FINANCE SERVICE.

Evelyn KINSEY
v.
CHESTERFIELD FINANCE COMPANY.

Willie C. LEMONS
v.
TIME FINANCE COMPANY.

Evelyn KINSEY
v.
YATES, POOLE & FOSTER, t/a
Atlanta Finance Company.
Civ. A. Nos. 14638–14642, 14660, 14661,
14859, 14860.

United States District Court,
N. D. Georgia,
Atlanta Division.

Oct. 1, 1971.

On Motion for Reconsideration
Dec. 1, 1971.

Margery Pitts Hames, Richard Roesel, John Harris Paer of Stack & O'Brien, Atlanta, Ga., for plaintiffs.

Lefkoff & Hanes, Atlanta, Ga., for American, Welcome, Jackson, City, Acme, and Yates.

Heyman & Sizemore, Atlanta, Ga., for Time and Chesterfield.

## ORDER

EDENFIELD, District Judge.

The question in these consolidated cases is whether defendants have violated the Truth in Lending Act, 15 U.S.C. § 1601 et seq. (1970), by disclosing a notary fee of $1.00 as a separate item on their small loan disclosure statements instead of including the fee in the "finance charge" and "annual percentage rate." The court finds that they have, and that plaintiffs are entitled to recover the statutory penalty imposed by 15 U.S.C. § 1640 (1970).[1]

### A. *The Truth in Lending Claim*

The avowed purpose of the disclosure provisions of the Truth in Lending Act ["the Act"] is

> " * * * to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601 (1970).

In order to accomplish this purpose the Act creates two artificial terms— "finance charge" and "annual percentage rate"—the determination of which is removed from the individual creditors and, instead, established by statute and regulation. The idea is to put a simple price tag on credit so that the consumer may "comparison shop" in credit transactions by looking at the "annual percentage rate." H.R.Rep.No. 1040, 90th Cong., 2d Sess. (1968).

These cases involve "close-end" consumer loans and § 1639 of the Act requires the creditors in such loans to disclose, among other things, "the amount of the finance charge" [§ 1639 (a) (4)] and "the finance charge expressed as an annual percentage rate" [§ 1639(a) (5)].[2] The "amount of the

---

1. Jurisdiction over these cases is conferred by 15 U.S.C. § 1640(e) (1970).

2. If, however, the "finance charge" does not exceed $5.00 and applies to an ex-

finance charge" which must be disclosed [3] is statutorily defined as

"* * * the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit. * * *" 15 U.S.C. § 1605(a) (1970).

Section 1605 gives several examples of typical charges which must be included in the "finance charge", such as a "premium or other charge for any guarantee or insurance protecting the creditor against the obligor's default or other credit loss" [§ 1605(a) (5)]. It also specifically exempts certain charges from inclusion in the "finance charge" if they are itemized separately and exempts other charges even if they are not itemized. For example, in credit transactions involving a security interest in real property the fees charged for notarizing deeds and other documents are excludable from the "finance charge." [§ 1605(a) (4).] Finally, the section provides that any other types of charges which are not for credit may be excluded from the "finance charge" if the Federal Reserve Board approves such exclusion by regulation. [§ 1605 (d) (4).] Among such excludable items approved by the Board are "license, certificate of title, and registration fees imposed by law." [12 C.F.R. § 226.4 (b) (4) (1971).]

On September 8, 1969, the Comptroller General of Georgia promulgated Rule No. 120–1–10–.03, which is apparently unique in this country, requiring promissory notes such as those involved in these consumer loans to be notarized. As a result of this rule defendants authorized their agents to have these notes notarized, and a $1.00 fee was imposed upon the borrowers. Plaintiffs contend that this fee is a "charge incident to the extension of credit" and since defendants itemized this fee as a separate charge and did not include it in the "finance charge" or the "annual percentage rate" they violated § 1639 of the Act. Their contention is based on the premise that any "charge incident to the extension of credit" which is not specifically excludable from the "finance charge" by statute or regulation must be included in it.

Defendants argue that the premise upon which plaintiffs' contention is based is wrong. Although these notary fees are not specifically exempted from inclusion in the "finance charge" by statute or regulation, defendants contend that the fees are not "incident to the extension of credit" but are incident to an independent legal requirement designed to protect the creditor against fraud. They say that the intent of the Act was to permit the exclusion of such charges from the "finance charge" as evidenced by the specific exemption accorded notary fees charged in credit transactions involving a security interest in real property. [§ 1605(e) (4).] Defendants claim it is reasonable to assume Congress did not contemplate Georgia would require notarization of promissory notes, since, apparently, no other state has such a requirement. But since the probable theory upon which is based the exclusion of notary fees in transactions involving security interests in real property applies to transactions involving consumer loans as well, defendants contend the court should read the Act to permit the exclusion of those notary fees from the "finance charge." Alternatively, defendants argue that the notary fees are registration fees imposed by law and therefore excludable from the "finance charge" under 12 C.F.R. § 226.-4(b) (4) (1971).

tension of credit not exceeding $75.00, or if the finance charge does not exceed $7.50 and applies to an extension of credit exceeding $75.00, only the "finance charge", and not the "annual percentage rate", must be disclosed.

3. The "annual percentage rate" is calculated by a complex formula and expresses the "finance charge" in percentage form. [§ 1606.]

The court agrees with plaintiffs' construction of the Act and their conclusion. As already noted, the design of the Act was to remove from the individual creditors the right to determine the "finance charge" and to establish by statute and regulation a uniform method for such determination so that consumers could "comparison shop" by looking at a single "price tag"—the "annual percentage rate." Given the purpose of the Act and the thrust of its provisions, the court concludes that only those charges specifically exempted from inclusion in the "finance charge" by statute or regulation may be excluded from it. The notary fees involved in these cases are not specifically exempted, therefore defendants were required to include them in the "finance charge." [4] Although the fee was only $1.00, its amount is immaterial as far as the disclosure requirements of the Act are concerned.[5] Defendants' alternative argument that the notary fees are registration fees imposed by law is without foundation. The rule issued by the Comptroller General only required that the promissory notes be notarized, it did not impose any notary fee. Notary fees in Georgia are authorized by law [Ga. Code Ann. § 71–110 (1964)] but they are not mandatory.

Since defendants have failed to disclose the "finance charge" as it is defined by the Act, they have failed to disclose information required to be disclosed under § 1639 and should be liable to plaintiffs under § 1640. However, defendants claim they are exempt from liability because their liability, if any, was "unintentional" and was a bona fide error which resulted despite their attempts to avoid such error. Under § 1640(c) of the Act,

"A creditor may not be held liable in any action brought under this section for a violation of this part if the creditor shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."

Defendants say that "intentional" means "bad faith" and that they exhibited no such bad faith. On the contrary, they argue, they "intended" to comply in every respect with the Act, and to that end their employees attended special seminars on the Act and all the disclosure statement forms were obtained from credit life insurance companies who are supposedly knowledgeable in this field. The court cannot accept this argument.

As has been held recently, § 1640(c) is clearly meant to exempt clerical errors which result despite reasonable safety precautions and not "good faith" errors of law such as committed here by defendants. Ratner v. Chemical Bank New York Trust Co., 329 F.Supp. 270 (S.D.N.Y., 1971). Defendants intentionally imposed the notary fees in

---

4. Moreover, the court notes that charges for any guarantee protecting the creditor against default or other credit loss are specifically mentioned as an example of charges that must be included in the "finance charge." [§ 1605(a) (5).] Defendants themselves say that the notary fees were designed to protect them against credit loss through fraud.

5. As plaintiffs point out, it is interesting to note that the effect of the exclusion of the $1.00 notary fee can be quite pronounced. In one of these cases the "amount financed" was shown as $79.20, the "finance charge" as $10.50, and the "annual percentage rate" as 45.35%. Had defendants properly included the notary fee in the "finance charge", the "amount financed" would have been $78.20, the "finance charge" $11.50, and the "annual percentage rate"—the crucial "price tag"—50.00%.

In addition, in two of these cases the "amount financed" was given as $55.22 and the finance charge was given as $5.00. Under the Act, the creditor would not be required in such a case to disclose the "annual percentage rate." [§ 1639(a) (5).] Had defendants in those cases properly included the $1.00 notary fee in the "finance charge" they would no longer have come under the exception of § 1639(a) (5) and would have been required to disclose the "annual percentage rate."

these cases, although they mistakenly did not include these fees in the "finance charge." Thus their act was intentional within the meaning of § 1640(c) and not a clerical error. If consumers would be required to prove that creditors were determined to violate the Act in order to prevail, the civil remedy would be a hollow one. Moreover, all defendants admit they did not seek any legal advice nor did they inquire of the Federal Reserve Board whether their treatment of the notary fees was proper.

Since § 1640(c) offers no help to defendants, they are liable to plaintiffs under § 1640(a).

B. *The State Claims*

Defendants in cases numbered 14638, 14639, 14640, and 14641 have counterclaimed to recover payments due on the promissory notes for which the disclosure statements were issued. Plaintiffs in these and the other cases consolidated here, on the other hand, have asked the court to declare the notes null and void because they claim the imposition of notary fees violates Georgia law and renders the notes illegal.

Neither plaintiffs nor defendants have briefed these issues at all. No evidence has been supplied by defendants to support their counterclaim and no cases or laws have been cited by plaintiffs to support their claim. Pendent jurisdiction is a doctrine of discretion and here considerations of judicial economy, convenience, and fairness to the parties militate against the adjudication of these state claims by this court. United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The state claims and counterclaims will be dismissed without prejudice and left for resolution to the state courts.

C. *The Releases*

Defendants in cases numbered 14639, 14640, 14641, and 14642 claim that plaintiff Daisy Lemons received

$10.00 from them in return for which she released them from all liability under the Act. Plaintiffs claim that these releases, which were signed after commencement of these actions, were obtained through material misrepresentations and, in any event, are void as against public policy.

The Truth in Lending Act clearly contemplates substantial enforcement through individual consumers acting as "private attorneys-general." Ratner v. Chemical Bank New York Trust Co., *supra.* No federal agency is provided by the Act with enforcement powers other than the ones they already possess. Criminal prosecutions are limited to cases involving wilful violation, which is difficult to prove. The Act was made necessary by the inability of individual consumers to obtain meaningful disclosure of credit costs from creditors and Congress evidently realized that only those individual consumers could effectively police compliance with the Act. The civil remedy was manifestly designed to be a strong deterrent to violation since consumers are guaranteed a minimum recovery plus costs and reasonable attorney's fees without having to prove damages. In a similar FLSA case the Supreme Court struck down a release of liquidated damages because permitting it to stand would have nullified the deterrent effect Congress plainly intended the civil remedy to have on employers. Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945). The Court there held:

"Where a private right is granted in the public interest to effectuate a legislative policy, waiver of a right so charged with the public interest will not be allowed where it would thwart the legislative policy which it was designed to effectuate." At 704, 65 S.Ct. at 901.

Under the principles announced in *Brooklyn Savings Bank* the court holds that the releases obtained by defend-

ants from Daisy Lemons are null and void.[6]

## D. *Res Judicata*

 Defendants in cases numbered 14660 and 14661 contend that the actions instituted against them in this court by plaintiff Evelyn Kinsey are barred under the doctrine of res judicata. They say they instituted actions against plaintiff Kinsey in Fulton County Civil Court to recover payments due on the promissory notes for which the disclosure statements involved here were issued. In those two cases plaintiff "counterclaimed" that the notes were null and void under Georgia law because Georgia law prohibited the imposition of notary fees. Those cases were later dismissed. Defendants argue that since plaintiff Kinsey raised the issue of the notary fees in the state court proceedings she may not raise that issue here.

Res judicata only bars the relitigation of a cause of action between parties who have already litigated that cause of. action. In the state courts plaintiff Kinsey "counterclaimed" that the imposition of the notary fees was a violation of Georgia law; here her claim is that the failure of defendants to include the notary fee in the "finance charge" violates the Truth in Lending Act. These are two distinct causes of action and plaintiff Kinsey is not barred from raising the federal claim here. The court intimates no views on whether defendants or plaintiff Kinsey may be barred from relitigating their state claims in state court.

## E. *Class Action*

 Plaintiffs in all these cases seek to maintain class actions. In order to do so they must satisfy the four requirements of Rule 23(a), Fed.R.Civ.P., and any one of the three subdivisions of Rule 23(b). The requirements of Rule 23(a) appear to be met and the question is whether these actions satisfy Rule 23(b) (3) which states:

"An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\*　　\*　　\*　　\*　　\*　　\*

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

The court concludes that on the basis of subparts (A) and (D) of Rule 23(b) (3) and the considerations mentioned in the Notes of the Advisory Committee which drafted the Rule, the maintenance of class actions in these cases is not appropriate.

 First, the individual members of the class of persons plaintiffs seek to represent have a strong interest in maintaining separate actions. In typical class actions, the court selects a date by which all members of the class who have not "opted out" must file their claims. In State of West Virginia v. Chas. Pfizer & Co., 314 F.Supp. 710 (S.D.N.Y.1970), aff'd., 440 F.2d 1079 (2d Cir. 1971), the notice devised by the court gave class members 45 days to file their claims. This particular notice form was selected as a model by the Manual for Complex and Multidistrict Litigation, Part II, §

---

**6.** Plaintiff Daisy Lemons concedes that the amounts she received for signing the releases will have to be deducted from her recovery.

1.65 (1970). But under the Act [§ 1640 (a)] consumers are given one year from the date of the occurrence of the violation to bring their action, and if the court were to select a relatively short period of time during which claims must be filed some consumers in the same circumstance as plaintiffs may be denied their civil remedy if for some reason they fail to receive notice. In fact, since defendants have numerous agencies which use their disclosure forms it would be impossible to determine a single fixed date in the near future by which all claims would have to be filed without running a substantial risk that some members of the class will be denied recovery. One of the purposes of the class action is to achieve economies of time and effort and neither would be achieved if the court set the filing date too far in the future.

Second, the potential members of the classes in these cases can be determined with relative precision from defendants' files. As a result, notice by first class mail would seem mandatory. Rule 23 (c) (2), Fed.R.Civ.P. In a decision which contains one of the most complete analyses of Rule 23, the Second Circuit held that the task of furnishing notice to class members rests upon the representative party when it is the plaintiff. Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 568 (2d Cir. 1968). This rule has been followed subsequently. *See, e. g.*, Weiss v. Tenney Corp., 47 F.R.D. 283, 294 (S.D.N.Y.1969). Here, however, plaintiffs—who have received legal assistance in these cases through the Atlanta Legal Aid Society—could not possibly pay for the required notice. Indeed, half the complaints were filed in forma pauperis. The court knows of no authority by which it could assume the cost of providing notice. That leaves only defendants. As to them, some cases have suggested that if plaintiffs cannot pay defendants ought to. *See* Herbst v. Able, 47 F.

R.D. 11, 22 (S.D.N.Y.1969); Dolgow v. Anderson, 43 F.R.D. 472, 499–500 (E.D.N.Y.1968). Recently, however, the district court to which the Second Circuit remanded the *Eisen* case reviewed this problem in detail and was simply unable to resolve it.[7] Eisen v. Carlisle & Jacquelin, 52 F.R.D. 253, 269–272 (S. D.N.Y.1971). Among that court's chief concerns were the probability that the imposition of notice costs upon defendants would encourage frivolous class actions and might also result in defendants' passing on to their customers those very costs. At 269. Even more recently it has been squarely held that when parties seek to maintain a class action but cannot assume the cost of providing the notice required by due process, the action cannot be maintained as a class action. Givens v. W. T. Grant Co., Civil Action No. 14296 (D.Conn., June 15, 1971).

█ Finally, the court notes that subparts (A) through (D) of Rule 23(b) (3) are only suggestive, not exhaustive, of the factors it should consider in deciding whether to allow a Rule 23(b) (3) class action. The primary determination is whether the class action is *superior* to—not just as good as—other available methods for handling the controversy. This, therefore, is an area in which the court is invited to exercise its discretion. Alameda Oil Co. v. Ideal Basic Industries, Inc., 326 F.Supp. 98, 105 (D.Colo.1971). *See also* City of New York v. International Pipe & Ceramics Corp., 410 F.2d 295, 298 (2d Cir. 1969). Recently, a three-judge court denied class action treatment in a welfare case without citing any of the subparts of Rule 23(b) (3). The court merely said that considering the facts of the case it had "misgivings as to the propriety of such a course" and would exercise "its prerogative under Rule 23 (c)"[8] to deny the request. Hunt v. Edmunds, 328 F.Supp. 468, 474 (D.Minn.

---

7. The court finally decided to hold a preliminary hearing on the merits in the hope that would help it decide the matter.

8. Rule 23(c) provides that the court shall issue an order determining whether a class action shall be maintained.

1971); *cf.* Amendments to Rules of Civil Procedure, Advisory Committee's Notes, 39 F.R.D. 69, 103 (1966). Consolidation has worked well in the instant cases and the decision of this court offers precedent for other potential members of the class plaintiffs seek to represent, who may, in the future, wish to maintain such actions.

The court believes that consolidation of these claims if or when they are brought is superior to the maintenance of class actions, and defendants' motions to terminate the class actions will be granted.

This is an appropriate moment for the court to express its grave concern over the increasing resort to the class action device in actions seeking monetary relief. The class action is supposed to "achieve economies of time, effort and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Advisory Committee's Notes, *supra*, 102–103. Today, however, many claims which simply did not exist have been brought to life by our courts through the judicial act of allowing a class action to be maintained. Although some courts say these claims are not brought because plaintiffs believe the potential recovery would be too small to justify the time and expense of litigation, the plain truth is that in many cases Rule 23(b) (3) is being used as a device for the solicitation of litigation. This is clearly an "undesirable result" which cannot be tolerated. Until otherwise directed this court, for one, intends to carefully scrutinize every action in which plaintiffs seek monetary relief and wish to represent a class of similarly situated persons to determine if all the requirements of Rule 23 are fully satisfied, and it will not hesitate to exercise whatever discretion is granted it by the Rule in such matters.

It is hereby ordered and adjudged that plaintiffs' motions for summary judgment are granted in part and denied in part as follows:

(1) Plaintiffs shall have judgment over and against defendants in the following amounts, plus allowable costs:

(a) CA No. 14638—$100.

(b) CA No. 14639—Jessie May Burnett, $100; Mary Buford, $100; Daisy Lemons, $97.50.

(c) CA No. 14640—Jessie May Burnett, $100; Mary Buford, $100; Daisy Lemons, $97.50.

(d) CA No. 14641—$97.50.

(e) CA No. 14642—$97.50.

(f) CA No. 14660—$100.

(g) CA No. 14661—$100.

(h) CA No. 14859—$100.

(i) CA No. 14860—$100.

(2) Plaintiffs' complaints praying for the rescission of the promissory notes for which the disclosure statements involved here were issued are dismissed without prejudice.

(3) Defendants' counterclaims praying for recovery of amounts due on the promissory notes for which they issued the disclosure statements involved here are dismissed without prejudice.

(4) The releases signed by plaintiff Daisy Lemons are hereby declared null and void.

(5) Defendants' motions to terminate these cases as class actions are granted.

It is so ordered.

### ORDER

#### On Motion for Reconsideration

Plaintiffs have moved this court for reconsideration of that portion of its order filed October 1, 1971 which terminated the class action in these consolidated cases. They also seek an award of reasonable attorneys' fees in accordance with 15 U.S.C. § 1640(a) (2) (1970). Plaintiffs contend that the court overlooked several important points which plaintiffs had not been given an opportunity to present.

First, plaintiffs say the termination of the class action will forever bar three-quarters of the 30,000 members of the proposed class from asserting their

rightful claims. Their argument is that they instituted this action in January, 1971, and sought to represent a class of persons who had received disclosure statements from defendants between January, 1970 and January, 1971. Since claims under the Truth in Lending Act must be brought within one year of the alleged violation, 15 U.S.C. § 1640(e) (1970), plaintiffs say that the termination of the class action bars all those who received disclosure statements between January, 1970 and October 1, 1970, even though those statements may have violated the Act.

Second, plaintiffs say that now they have prevailed on the merits, it is irrelevant that they could not assume the responsibility of providing notice by first-class mail to class members as would be required. Such a responsibility, they argue, can now legitimately be cast upon defendants who have lost.

Plaintiffs also raise a number of other points, but the court believes they were dealt with adequately in the October order.[1]

■■■ As to Point One, this court's order did not "bar" anyone from asserting rightful claims. Those members of the proposed class who were given disclosure statements which violated the Truth in Lending Act could have filed their claims just as freely as plaintiffs did in these consolidated cases. Plaintiffs' argument is valid only if one assumes that other members of the proposed class purposely refrained from filing their individual claims because they relied upon the maintenance of a class action in the instant cases. Those members who can prove such reliance should not be penalized for failing to file parallel individual actions or motions to intervene. It would be inconsistent with the purpose of Rule 23 to insist that in every lawsuit in which a plaintiff seeks to maintain a class action the proposed

members of the class file precautionary individual actions. *See generally,* Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452, 460–461 (E.D.Pa.1968). To remedy the situation the court will modify its order to allow members of the proposed class to present proof of reliance upon the maintenance of the class action sufficient to toll the statute of limitations.

■■■ As to Point Two, plaintiffs do not challenge the court's conclusion that they are unable to assume the responsibility of providing proper notice to class members. They merely seek to shift that responsibility on the basis of "hindsight" victory on the merits. Neither of the cases cited by plaintiffs—Berland Mack, 48 F.R.D. 121 (D.C.N.Y.1969), and Berman v. Narragansett Racing Ass'n, 48 F.R.D. 333 (D.C.R.I.1969)— supports this position. Indeed, in both cases *plaintiffs* assumed the responsibility of providing notice. The court finds no reason to reconsider its order in this regard. As the Second Circuit has noted:

> "[I]f the court finds that a considerable number of members of the class can be identified with reasonable effort, and financial considerations prevent the plaintiff from furnishing individual notice to these members, there may prove to be no alternative other than the dismissal of the class suit." Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 570 (2d Cir. 1968).

■■■ Originally this court did not grant attorneys' fees because plaintiffs had been represented by the Atlanta Legal Aid Society which is not permitted to accept an award of fees. Plaintiffs now show that at some point these cases were referred to private counsel. As a result, the court will award now the single sum of $360 to plaintiffs as a group for reasonable attorneys' fees. From that single sum plaintiffs shall

---

1. Plaintiffs' reliance upon Dolgow v. Anderson, 43 F.R.D. 472 (E.D.N.Y.1968), to support their position about the su-periority of the class action may have been premature. *See* Dolgow v. Anderson, 53 F.R.D. 664 (E.D.N.Y.1971).

proportionately allocate attorneys' fees to their private counsel.

Accordingly, it is ordered, decreed and adjudged that plaintiffs' motion for reconsideration of this court's order filed October 1, 1971 be granted in part and denied in part.

The motion is granted in part as follows:

(1) Although these cases may not proceed as class actions, any member of the proposed class who did not file an individual claim solely because he relied upon the maintenance of a class action in these cases and whose claim is now barred by the applicable statute of limitations, may present this court with proof of such reliance and move to toll the statute of limitations with respect to his claim.

(2) Plaintiffs as a group shall recover over and against defendants as a group the single sum of $360 for reasonable attorneys' fees. From that single sum plaintiffs shall proportionately allocate attorneys' fees to their private counsel.

In all other respects the motion is denied.

It is so ordered.