**In re John R. CELONA, Jr. and Marion M. Celona, Debtors.**

**John R. CELONA, Jr. and Marion M. Celona, Plaintiffs,**

v.

**EQUITABLE NATIONAL BANK, Defendant.**

**Bankruptcy No. 87–02452S.
Adv. No. 88–0437S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Aug. 29, 1988.

As Amended Sept. 28, 1988.

---

Richard J. Friedman, Community Legal Services, Philadelphia, Pa., for plaintiffs/debtors.

Edward Sparkman, Philadelphia, Pa., Chapter 13 Trustee.

Howard Greenberg, Lawrence Phelan, Philadelphia, Pa., for defendant/creditor.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The matters presently before the court require us to revisit our line of cases which consider whether consumer-debtors have a right to rescind a consumer financing transaction pursuant to § 125 of the federal Truth-in-Lending Act, 15 U.S.C. § 1601, et seq. (hereinafter referred to as "TILA"), and what the consequences of such a rescission are. *See In re Gurst,* 79 B.R. 969 (Bankr.E.D.Pa.1987), *appeals dismissed,* C.A. No. 87–3351 (E.D.Pa. June 22, 1988); and C.A. No. 88–2902 (E.D.Pa. August 9, 1988); *In re Jones,* 79 B.R. 233 (Bankr.E.D. Pa.1987), *appeal dismissed,* C.A. No. 87–7630 (E.D.Pa. May 12, 1988); *In re Melvin,* 75 B.R. 952, *appeal pending,* C.A. No. 87–5712 (E.D.Pa.); and *In re Tucker,* 74 B.R. 923, 932 (Bankr.E.D.Pa.1987), *appeal dismissed,* C.A. No. 87–4456 (E.D.Pa. May 24, 1988). We hold, consistently with the results in those cases, that material violations of the TILA have occurred in the transaction in issue. In particular, the lender (1) Failed to disclose, as part of the finance charge in the transaction, fees paid to its counsel to review the Debtors' documents, which we hold are not within the narrow scope of charges in connection with transactions secured by realty pursuant to 15 U.S.C. § 1605(e) which may be excluded from the finance charge; and (2) Allowed the loan proceeds to be disbursed prior to the three-day "cooling off" period, in violation of 12 C.F.R. § 226.23(c). The consequences, as in the foregoing cases, are rather severe: the lender loses its security interest; its remaining, unsecured claim is reduced to the net proceeds of the loan, less the payments made by the Debtors, less a $1,000.00 recoupment penalty; and it is obliged to remit a $1,000.00 statutory penalty plus attorney's fees and costs to the Debtors' counsel. As a further consequence, the lender's motion for relief from the automatic stay, premised on the presence of a valid mortgage against the Debtors' realty, must be denied.

### B. PROCEDURAL HISTORY

The Debtors, husband and wife who are the parents of seven children, commenced the instant joint Chapter 13 bankruptcy case on May 19, 1987. On March 1, 1988, EQUITABLE NATIONAL BANK (referred to hereinafter as "the Creditor"), filed a motion seeking relief from the automatic stay pursuant to 11 U.S.C. § 362(d) to pursue a mortgage foreclosure action against the Debtors. The Debtors filed an answer to this motion on March 22, 1988, the most prominent defense being the assertion that, since the Debtors had validly rescinded the underlying loan contract, the mortgage was invalid and the basis of the motion was undercut.

Meanwhile, on March 23, 1988, the Debtors filed the instant adversarial proceeding, affirmatively asserting the contention that they had validly rescinded the loan and that the Creditor's proof of claim was accordingly subject to attack. The § 362(d) motion was, by agreement of the parties, continued to May 11, 1988, where it was consolidated with the date set for the trial of the adversary proceeding and the fourth continued listing of the confirmation hearing in the Debtors' case.

On May 11, 1988, the parties requested a further continuance of all of these matters until June 14, 1988. We concurred, but entered an Order that the matter must be tried on June 14, 1988. Nevertheless, on June 14, 1988, the parties came before us and requested a *further* continuance. With some reluctance and only upon the entry of a Pre-trial Order which not only rescheduled the hearing on July 13, 1988, but also set forth a post-trial briefing schedule contemplating completed submission of briefs on the contested matters by August 10, 1988, we agreed.

This Order accomplished its purpose of assuring that the trial was conducted on July 13, 1988. Thereafter, we reaffirmed the briefing schedule set forth in our prior Order, although allowing the Debtors an additional period until August 17, 1988, to file a Reply Brief, and scheduling the confirmation hearing, presumably for the last time, on September 8, 1988. On August 16, 1988, the Debtors advised that they wished to eschew the opportunity to file a Reply Brief.

Because the matters before us involve some issues concerning which we must make determinations of credibility and include an adversary proceeding, which is subject to the dictates of Bankruptcy Rule (hereinafter "B.Rule") 52 and Federal Rule of Civil Procedure (hereinafter "F.R.Civ. P.") 52(a), we are preparing this Opinion by setting forth specifically-numbered Findings of Fact and Conclusions of Law. We shall embrace discussion of the credibility issues in extended Findings of Fact and of any significant legal points in extended Conclusions of Law.

C. FINDINGS OF FACT

1. On Tuesday, July 23, 1985, JOHN AND MARION CELONA, the Debtors (hereinafter "the Debtors"), agreed to purchase a used Jeep Wagoneer motor vehicle (hereinafter "the Jeep") from Victory AMC/Jeep, Inc. (hereinafter "Victory"), an automotive retailer, for a price of $4,903.34.

2. The Victory salesman who handled the transaction, identified phonetically as "Gary Guzzi" (hereinafter "Guzzi"), assured the Debtors, who indicated that they needed financing, that he would obtain financing with "someone he knew."

3. Guzzi later advised the Debtors to return the following day to sign the necessary papers, which they did. Among the papers executed at the time were a Secondary Mortgage Loan contract, a Mortgage, and a TILA disclosure statement reflecting that the Debtors received a net sum of $5,197.50 in a direct loan transaction with the Creditor. The Debtors received this sum in the form of two checks made out to

them and endorsed by them at that time in the sums of $5,145.59 and $51.91. The disclosure statement included, *inter alia*, the following entry: "Amount paid to Meltzer & Schiffrin, Esq. for attorney's fees . . . $200.00." Since the transaction resulted in a mortgage of their residential realty, the Debtors were required by 15 U.S.C. § 1635 of the TILA, to receive, and did receive and execute, a notice of their right to rescind the loan transaction on or before midnight of July 27, 1985.

4. The Debtors both testified that only Guzzi and themselves were present on July 24, 1985. The Creditor's loan officer, Louis Leone, originally testified that he was present on that date also. However, Mr. Leone first conceded that he only vaguely remembered the transaction; then admitted that he had no recollection at all and just remembered it by the way it was handled; and near the end of his testimony stated that he was only at Victory one time and definitely was there on July 29, 1985. We find the Debtor's consistent recollections concerning the events of July 24, 1985, as in all of the instances of conflict in their testimony with that of Mr. Leone, to be far more credible. The Debtors had numerous small personal recollections of the events; Mr. Leone ultimately conceded that he had none except doubtful records and equally doubtful "established procedures" that he claimed to have followed.

5. The Debtors testified that, on Friday, July 26, 1985, Guzzi called them and told them that they could pick up the Jeep that evening. The Debtors testified that they did get the Jeep that evening after an encounter with Guzzi and an insurance agent who sold them insurance at Victory's place of business, and that they used the Jeep that evening to take their large family to visit the Husband–Debtor's parents in York, Pennsylvania. It seems apparent, and the parties appear to agree, that, if this recitation were true, the Creditor must have distributed the loan proceeds to Victory prior to midnight of July 27, 1985, because Victory would have been most unlikely to have allowed the Debtors to take

the Jeep before the loan proceeds were paid to it.

6. Mr. Leone, realizing this, based his defense on this issue on his contention that the Debtors came to Victory on Monday, July 29, 1985, to consummate the transaction. This recitation was supported by the fact that the checks were dated July 29, 1985; the production of a "Certification of Confirmation" that the Debtors did not wish to cancel the transaction dated July 29, 1985; and a notation on the Creditor's file jacket that the checks were drawn on July 29, 1985. However, the Debtors were adamant that they had not signed any documents in the transaction on July 29, 1985. Mr. Leone conceded that he had no actual recollection of the transaction and could, in contrast to the Debtors, recite no details of the transaction. The check dates could obviously have been typed in at any time; the handwriting of the dates on the Certification was not that of the Debtors; and the dates on the file jacket appear to have originally been 7–26–84 and subsequently written over as 7–29–85. We therefore totally reject the Creditor's contention that its position is supported by documentation rather than mere testimony, in purported contrast to the position of the Debtors, and thus should be accepted where conflicts exist. As a business institution, the Creditor would be more apt to have access to documentary evidence to support its position than the Debtors. The documentary evidence produced casts more doubts upon the Creditor's version of the facts than it tends to resolve in its favor.

7. The Debtors' recitation of the facts concerning the final execution of the papers was, again, far more credible than that of Mr. Leone. We note that the Debtor–Wife testified that she did not recall whether Mr. Leone was at Victory on July 26, 1985. However, she was consistent, and therefore more believable than Mr. Leone, even in her uncertainty. We also note that Mr. Leone testified that he was *not* at Victory on July 26, 1985. We also note that Mr. Leone clearly overstated the facts when he stated that Jerry Silver, the Creditor's President, "wouldn't sign for nobody" in disbursing a check prior to the expiration of the rescission period. The Creditor's predecessor has been held by the District Court, in three transactions in which the decisions were rendered *after* the instant transaction, to have disbursed funds to borrowers prior to the running of the three-day rescission period. *Curry v. Fidelity Consumer Discount Company,* 656 F.Supp. 1129, 1130–31 (E.D.Pa.1987); *Laubach v. Fidelity Consumer Discount Co.,* C.A. No. 85–1902, slip op. at 3–13 (E.D.Pa. April 9, 1986) [available on WESTLAW, 1986 WL 4464]; and *Solis v. Fidelity Consumer Discount Co.,* 58 B.R. 983, 986 (E.D.Pa.1987). While the Creditor emphasized that these transactions occurred at a different office of the Creditor than handled this transaction, Mr. Silver is the President of the entire company. Given all of these factors, we conclude, without hesitation, that the Debtors are far more reliable in relating the proper sequence of events. It appears that the Creditor, through its admitted past actions of postdating forms in *Curry* and *Laubach;* altering its file records; and the testimony of Mr. Leone was simply trying to cover its illegal, premature consummation of the transaction.

8. On or about July 24, 1985, Mr. Leone forwarded the papers executed by the Debtors on July 24, 1985, to Meltzer and Schiffrin (hereinafter "M & S"), requesting that that law firm "review these documents and forward your bill." The parties stipulated that no M & S attorney attended the settlement of the loan nor performed a title search in connection therewith.

9. On July 29, 1985, M & S sent a bill for $200.00 for services to Mr. Leone, informing him that the address of the property was incorrect on the note and that the mortgage had not been notarized. Mr. Leone admitted that the notary, his secretary, affixed her notarization upon his advice to her that *he* saw the Debtors sign it. No correction of the address was ever made.

10. The Debtors did not deny the accuracy of the Creditor's records showing that they made only nine of 36 payments due on the loan obligation, the last payment of

which was made in July, 1986, and that the total payments made totaled $1,770.90.

11. On March 11, 1988, after the filing of their instant bankruptcy case, the Debtors, by their counsel, directed a letter to the Creditor indicating that they rescinded the transaction on the ground that the Creditor violated the TILA "including, but not limited to" the failure to include the payment to M & S in the "finance charge" and stating that, upon the Creditor's performance of its TILA obligations, they "will make appropriate tender." The Creditor did not respond in any way to this letter.

## D. CONCLUSIONS OF LAW

*1. Since the adversary proceeding is litigation concerning the validity of the Creditor's Proof of Claim, the Creditor bears the ultimate burden of producing a preponderance of evidence to support its claim, not the Debtors the burden of producing a preponderance of evidence that the claim is invalid.*

■ At several points in its Brief, the Creditor appears to express a belief that there is some sort of presumption in its favor which carries a substantial impact throughout this litigation and requires us to give greater weight to the documentary evidence which purportedly supports the Creditor's position, as opposed to the strictly testimonial evidence which supports the position of the Debtors. The principal authorities cited by the Creditor on this point are *In re Wells,* 51 B.R. 563 (D.Colo.1985); and B.Rule 3001(f).

Although cast as an adversary proceeding, the matter is properly classified as a proof-of-claim litigation. The respective burdens of proof of interested parties in such matters is addressed by us with utmost clarity in *In re Lewis,* 80 B.R. 39, 40–41 (Bankr.E.D.Pa.1987). As we indicate in the first and third scenarios described therein, it is true that if a debtor, in objecting to a proof of claim, produces little or no evidence to support an objection, the claim stands. This conclusion is entirely consistent with B.Rule 3001(f).

However, here, we are presented with the fifth scenario outlined in *Lewis,* i.e., both parties have appeared and presented evidence at the hearing. In such a case, where the debtor presents some evidence tending to rebut the validity of the proof of claim, "the 'bubble' of the presumption is 'burst' by the objector's evidence" and the claimant assumes the same procedural position as "the party plaintiff or movant" which must prove its case "by a preponderance of the evidence." *Id.* at 41. *See also In re Jordan,* 91 B.R. 673, 676 (Bankr. E.D.Pa. 1988).

This analysis is nearly consistent with that outlined in *Wells, supra,* 51 B.R. at 566, although we would conclude, somewhat in contrast to the *Wells* court, that, if the evidence is equal in probative force, the debtor, not the claimant, should prevail.

In the instant case, we do not find the evidence to be equal in probative force. As Findings of Fact 6 and 7, page 108 *supra,* clearly manifest, we find the Debtors' version of the disputed facts to be much more credible than that of the Creditor. This credibility finding, as is indicated in the following Conclusion of Law, is almost sufficient in itself to resolve the issue of the TILA violation discussed immediately hereafter.

*2. The Debtors have established that the Creditor prematurely distributed funds to them, in violation of 12 C.F.R. § 226.23(c).*

■ The substance of the violation alleged by the Debtor here is very similar to that which we found actionable in *Gurst, supra.* The TILA, at 15 U.S.C. § 1635(a), provides a debtor who gives a lender a security interest on his principal dwelling in a consumer financing transaction a three-day cooling-off or rescission period. To make certain that a lender does not become over-anxious to consummate such a transaction before the three-day period expires, thus rendering it impossible to undo such a transaction in the contingency that the consumer does attempt to rescind, the Board of Governors of the Federal Reserve System has issued the following regulation

as part of Regulation Z, 12 C.F.R. § 226.23(c):

(c) Delay of creditor's performance. Unless a consumer waives the right of rescission under paragraph (e) of this section, no money shall be disbursed other than in escrow, no services shall be performed and no materials delivered until the rescission period has expired and the creditor is reasonably satisfied that the consumer has not rescinded.

We must pay deference to this regulation, as to all official pronouncements of the Federal Reserve Board regarding the TILA discussed hereinafter unless same are "demonstrably irrational." *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980). In *Gurst,* 79 B.R. at 975, we quoted Judge Newcomer's following explanation of the rationale for this regulation, which he set forth in both *Curry,* 656 F.Supp. at 1131; and *Laubach,* slip op. at 9–10:

"First, it allows the consumer an opportunity to reflect, in the quiet of her home and without any pressure, whether to undertake a loan transaction which would create an encumbrance on the home. Second, it insures that if the consumer decides to cancel, she will not be without the ability to do so (i.e., she cannot spend the loan proceeds). *Rudisell v. Fifth Third Bank,* 622 F.2d 243, 249 n. 9 (6th Cir.1980)."

The facts of the instant matter could scarcely be more like the facts of *Curry, Laubach,* or *Solis.* All involved transactions in which the predecessor of the same lender financed automobile purchases in which it took, as security, mortgages against the borrowers' respective residences. Hence, a rights of rescission arose in each instance. In each of those transactions, the lender used the same "Certificate of Confirmation" form, apparently as an otherwise unnecessary attempt to provide a paper trail that the borrower chose not to exercise the right to rescind. The only distinction was that, in those instances, the lender *admittedly* disbursed the loan proceeds to the respective automobile vendors

on the same day as the loan and admittedly post-dated the respective Certificates. Here, the loan transaction was alleged by the Debtors to have been consummated by disbursement of the proceeds two days after the loan papers were executed. This is, however, still problematical for the Creditor because it is *within* the requisite, *three-*day period. The creditor, here, denies that the loan proceeds were disbursed within the three-day period or that the Certificate was post-dated. Nevertheless, our credibility determinations cause us to accept the version of the facts related by the Debtors. This dooms the Creditor to defeat on this issue.

It might be queried why this particular lender, of all lenders, would be careless enough to persist in permitting premature disbursements of loan proceeds in light of the disastrous consequences of its doing so in *Curry, Laubach,* and *Solis.* The answer may be in the fact that the earliest unfavorable decision on this issue was received by the Creditor in these cases on February 14, 1986, when the District Court reversed a decision of April 6, 1984, in favor of the Creditor. *See* 38 B.R. 293 (Bankr.E.D.Pa.1984). The instant transaction occurred in July, 1985. Therefore, at the time of the transaction, the Creditor apparently had no premonition that this method of operation would be subsequently determined to be illegal.

Of course, each of these cases must stand on its own facts. We have no hesitancy in finding a clear violation of 12 C.F.R. § 226.23(c) on this record.

There is little doubt that this violation was sufficiently material to accord the Debtors a right to rescind the transaction, as it represented a clear attempt to reduce the three-day rescission period allowed by 15 U.S.C. § 1635(a) and 12 C.F.R. §§ 226.-23(a) and (b). *Compare Jones, supra,* 79 B.R. at 236; *Melvin, supra,* 75 B.R. at 955–56; and *Tucker, supra,* 74 B.R. at 932. *Accord, Curry, supra,* 656 F.Supp. at 1132; and *Gurst, supra,* 79 B.R. at 975.

*3. The Creditor has also committed a material violation of the TILA by attempting to pass along the $200.00 fee to*

*its counsel exclusively for reviewing the transaction documents to the Debtors.*

█ The question of the Creditor's right to impose the $200.00 fee charged by M & S for reviewing the Debtors' loan documents is justified by the Creditor on the ground that this charge may be excluded from the finance charge in the transaction on the basis of 15 U.S.C. § 1605(e), which provides as follows:

(e) The following items, when charged in connection with any extension of credit secured by an interest in real property, shall not be included in the computation of the finance charge with respect to that transaction:

(1) Fees or premiums for title examination, title insurance, or similar purposes.

(2) Fees for preparation of a deed, settlement statement, or other documents.

(3) Escrows for future payments of taxes and insurance.

(4) Fees for notarizing deeds and other documents.

(5) Appraisal fees.

(6) Credit reports.

This statutory provision is further refined in the applicable regulations at 12 C.F.R. § 226.4(c)(7) as follows:

(7) The following fees in a transaction secured by real property or in a residential mortgage transaction, if the fees are bona fide and reasonable in amount:

(i) Fees for title examination, abstract of title, title insurance, property survey, and similar purposes.

(ii) Fees for preparing deeds, mortgages, and reconveyance, settlement, and similar documents.

(iii) Notary, appraisal, and credit report fees.

(iv) Amounts required to be paid into escrow or trustee accounts if the amounts would not otherwise be included in the finance charge.

This regulation is, in turn, the subject of further elucidation in the following excerpt from *Official Staff Commentary on Regulation Z Truth in Lending,* published by the Board of Governors of the Federal Reserve System (hereinafter referred to as *"Commentary"*):

Paragraph 4(c)(7)

1. Real estate or residential mortgage transaction charges. The list of charges in section 226.4(c)(7) applies both to residential mortgage transactions (which may include, for example, the purchase of a mobile home) and to other transactions secured by real estate. The fees are excluded from the finance charge even if the services for which the fees are imposed are performed by the creditor's employees rather than by a third party. In addition, credit report fees include not only the cost of the report itself, but also the cost of verifying information in the report. If a lump sum is charges for several services and includes a charge that is not excludable, a portion of the total should be allocated to that service and included in the finance charge. *A charge for a lawyer's attendance at the closing or a charge for conducting the closing (for example, by a title company) is excluded from the finance charge if the charge is primarily for services related to items listed in section 226.4(c)(7) (for example, reviewing or completing documents), even if other incidental services, such as explaining various documents or disbursing funds for the parties, are performed.* In all cases, charges excluded under section 226.4(c)(7) must be bona fide and reasonable (emphasis added).

The Debtors contend that the $200.00 fee was neither reasonable for the small measure of services provided by M & S nor within the scope of any of the items outlined in 15 U.S.C. § 1605(e) and 12 C.F.R. § 226.4(c)(7). We cannot agree that the fees charged were proven to be unreasonable. They were apparently negotiated by the Creditor at arm's length with M & S, albeit with the apparent expectation that they could and therefore would be passed through to the borrowers, and they are relatively modest. Most importantly, however, the Debtor produced no *evidence*

from which we could infer that these charges were excessive.

The Debtors fare far better on the issue of whether the services provided were within the scope of those which the applicable law and regulation deems excludable from the finance charge. It is well-established that "only those charges specifically exempted from inclusion in the 'finance charge' by statute or regulation may be excluded from it." *Buford v. American Finance Co.*, 333 F.Supp. 1243, 1247 (N.D. Ga.1971). *See also Abbey v. Columbus Dodge, Inc.*, 607 F.2d 85, 86 (5th Cir.1979); *Campbell v. General Finance Co.*, 523 F.Supp. 989, 992 (W.D.Va.1981); *Dalton v. Bob Neill Pontiac, Inc.*, 476 F.Supp. 789, 794 (M.C.N.C.1979); and *Campbell v. Liberty Financial Planning, Inc.*, 422 F.Supp. 1386, 1388–89 (D.Neb.1976).

A fair reading of 15 U.S.C. § 1605(e) and 12 C.F.R. § 226.4(c)(7) is that they permit exclusion, in transactions secured by real property, of only services directly and uniquely related to such transactions, such as fees for obtaining title reports and preparing settlement documents and having counsel attending a prerequisite real estate closing. Thus, the *Commentary* allows a creditor to exclude charges for such services. It also allows the sole task assigned to M & S here, i.e., reviewing documents, to be excluded from the finance charge *if* such services are "incidental" to other services which are excludable. However, the clear inference of the *Commentary* passage is that when such services are *not* merely incidental to excludable services, they are *not* excusable.

The only services performed by M & S were reviewing documents. The Creditor stipulated that M & S did not attend the settlement or closing nor did it perform a title search. Review of documents, in and of itself, is not a service itemized as excludable under the statute or the regulation. *Buford* and the cases consistent with it teach that exclusions from the finance charge should be narrowly construed. We should add that the services provided by M & S for the Creditor here—reviewing documents—are *not* uniquely limited to transactions involving security interests on realty.

The Creditor's failure to accurately include the $200.00 paid to M & S in the finance charge, also constitutes a "material disclosure" violation of the TILA *per se.* 15 U.S.C. § 1602(u). Furthermore, the failure to add the $200.00 paid to M & S into the finance charge skews the disclosure of the annual percentage rate in the transaction, which is an independent "material disclosure" violation of the TILA *per se. Id.* Therefore, the violations flowing from the failure to disclose the $200.00 payment to M & S as part of the finance charge in themselves accord the Debtors a right to rescind the instant loan transaction.

*4. The Creditor's failure to properly respond to the Debtors' valid rescission of the transaction eliminates any duty on the part of the Debtors to tender any property to the Creditor as a condition for rescission.*

The Creditor cites the decisions in *LaGrone v. Johnson*, 534 F.2d 1360, 1362 (9th Cir.1976); and *Baker Bank & Trust Co. v. Matthews*, 401 So.2d 1246, 1251 (La. App.1981), for the principle that, since the Debtors' rather vague promise to "make appropriate tender" upon the Creditors' performance of its duties was empty, in light of their bankruptcy filing, the Debtors should be barred from exercising the remedy of rescission.

Initially, we note that these cases do not hold that the respective borrowers' defective tenders barred them from rescinding their respective loans. In fact, the borrowers in each of those cases were held to be entitled to rescind their respective loans. However, in each case, the respective courts rejected the contentions of the borrowers that they were allowed to retain the loan proceeds and directed the borrowers to repay at least part of the loans.

Moreover, our District court, in *Aquino v. Public Finance Consumer Discount Co.*, 606 F.Supp. 504, 507–09 (E.D.Pa.1985), expressly rejects the argument that the borrower has any obligation to make any tender until the lender performs its duties to return any money paid to it by the

borrower and terminate any security interests taken by the lender in the transaction. As we stated in *Tucker, supra,* following the clear language of 15 U.S.C. § 1635(b) and the holding in *Aquino,* "an obligation of the Debtor to tender property received from the creditor is triggered *only* if the creditor appropriately reacts to the rescission by returning the property given and satisfying any security interest taken within twenty days." 74 B.R. at 933.

■ The Creditor also contends that the Debtors' rescission is defective, at least insofar as the premature disbursement issue is concerned, because their counsel's rescission letter recited only the contention that the $200.00 fee to M & S was improperly excluded from the finance charge, not the "premature disbursement" issue. This argument is rendered moot by our holding that this letter was correct in suggesting that the exclusion of this sum from the finance charge stated a sufficient basis for rescission in itself. However, *Aquino* answers this argument in any event by its holding that the borrower's only duty is to advise the lender of an intention to rescind without requiring citation to any specific TILA violation. 606 F.Supp. at 507–08. The *Aquino* court goes on to explain that the lender could have responded by inquiring of the borrower's reasons for seeking rescission and that, if it disagreed with the borrower's position, petition the court for declaratory relief. *Id.* at 608. However, like the *Aquino* lender, the Creditor here did nothing. It therefore took no action which could have triggered the responsibility of the Debtors' here to make a tender to the Creditor.

Therefore, we conclude, quite easily on the instant record, that the Creditor made an inappropriate response to the Debtors' notice to it that they believed that they had a right to rescind. Consequently, no obligation of the Debtors to make a tender in response as a condition for rescission arose.

*5. The Debtors's right to rescind is not affected by the fact that they exercised it after they filed their bankruptcy case.*

■ The Creditor presents the following rather convoluted argument: (1) The Debtors dispatched their notice seeking to effect a rescission post-petition; (2) At that time, had the Creditor properly responded pursuant to 15 U.S.C. § 1635(b), they could not have performed their duty to make a proper tender without complying with 11 U.S.C. §§ 1303 and 363; and (3) The Debtors did not request permission from this court at any time to transfer property to the Creditor pursuant to 11 U.S.C. §§ 1303 and 363. Therefore, their rescission attempt was at odds with the Bankruptcy Code and invalid.

One glaring difficulty with the reasoning of this syllogism is that the Creditor did *not* properly respond to the attempted rescission and therefore the Debtors had no duty to perform any duty of tender. This renders the question of what potential unfulfilled duties the Debtors might have had, had the Creditor properly responded, moot.

Furthermore, the sequence of a debtor's filing a bankruptcy petition first and thereafter rescinding a loan transaction is one with which we have been frequently confronted in the past, and have found not to be troublesome in the least. *See Jones, supra* 79 B.R. at 234, 235–36 (bankruptcy filed November 10, 1986; rescission noticed January 2, 1987); *Melvin, supra,* 75 B.R. at 953, 954 (bankruptcy filed December 26, 1985; rescission noticed January 12, 1987); and *Tucker, supra,* 74 B.R. at 927 (bankruptcy filed September 22, 1986; rescission noticed November 13, 1986). An even more dramatic factual pattern was presented in *In re Piercy,* 18 B.R. 1004, 1005 (Bankr.W.D.Ky.1982), where the debtors were permitted to rescind a loan contract when they first asserted their desire to rescind three months after they had received their discharge in bankruptcy.

Therefore, we fail to see why the Debtors' rescission should be impacted adversely in any manner simply because they effected it subsequent to their bankruptcy filing.

*6. The Creditor is not entitled to an order directing the Debtors to remit payments to it as a condition of rescission,*

*especially in light of the Debtors' bankruptcy filing.*

The Creditor finally contends that it is entitled to the equitable remedy of repayment of its loan as a condition of the rescission. Since it appears to recognize that, due to the presence of their bankruptcy, it cannot recover the repayment of the loan balance, it suggests that the Debtors should be barred from rescinding the loan due to equitable considerations.

We acknowledge the presence of directives in the court orders in *Curry, supra,* 656 F.Supp. at 1133; and *Aquino, supra,* 606 F.Supp. at 510–11, as well as the holdings of *LaGrone, supra;* and *Baker Bank, supra,* requiring the respective rescinding borrowers to repay at least a portion of their outstanding loan balances even though rescissions were permitted.

However, as we pointed out in *Gurst, supra,* 79 B.R. at 979; and *Tucker, supra,* 74 B.R. at 933, the actual language of 15 U.S.C. § 1635(b) itself suggests that a result much harsher to the creditor who fails to properly respond to a rescission request than those cases impose is in order. In its initial response to the notice of rescission, the lender is obliged to return "any money ... given as earnest money, downpayment, or *otherwise*" (emphasis added), which would require repayment to the borrower of all installments made. Furthermore, if the lender fails to properly accept a tender made by the borrower, "ownership of the property [of the obligor offered to the creditor in the tender] vests in the obligor without obligation on his part to pay for it." These harsh directives of § 1635(b) are tempered only by the last sentence which gives a court a power to "otherwise order" if it believes that the equities justify a different result. However, as we stated in *Tucker,* 74 B.R. at 933, to read this sentence and the companion regulation, 12 C.F.R. § 226.23(d)(4), too broadly would constitute "an overprotective attitude towards creditors [which] would fly in the face of the clear language of § 1635(b) and eliminate any incentive to creditors to utilize the self-enforcing aspects of § 1635(b) by voluntarily agreeing to tender the performance contemplated by the first sentence of § 1635(b)."

We therefore question the result of such cases as *LaGrone, Baker Bank,* and, on this point, *Curry,* 656 F.Supp. at 1133; and *Aquino,* 606 F.Supp. at 511–12, which seem to assume that imposing a continuing obligation upon the borrower to pay the rescinded loan is the normative judicial response, rather than one reserved for circumstances where the equities compel a result at odds from the consequences directed by plain language of the preceding portions of § 1635(b). We note that, in *Gill v. Mid–Penn Consumer Discount Co.,* 671 F.Supp. 1021, 1026 (E.D.Pa.1987), *aff'd,* 853 F.2d 917 No. 87–1719 (3d Cir. June 15, 1988) (table), the District Court recently excused a rescinding borrower from paying the outstanding loan balance. *Accord, Arnold v. W.D.L. Investments, Inc.,* 703 F.2d 848, 853 (5th Cir.1983); and *Gurst, supra,* 79 B.R. at 979.

Here, as in *Tucker, supra,* 74 B.R. at 933, the Debtors have not requested that the entire balance owed to the creditor be eliminated. They merely ask that the claim of the Creditor be reclassified as unsecured and reduced by a $1,000.00 statutory penalty in the nature of recoupment. The Creditor apparently contends that, in light of the Debtors' bankruptcy, its remaining unsecured claim will go unpaid and that this result, being inequitable, must be altered by denying rescission. This is certainly a novel suggestion, and one not supported by *LaGrone, Baker Bank, Curry, Aquino,* or any other known authority. The borrowers, in those cases, were obliged to repay the balance of their loans, after deduction of certain sums including statutory penalties, but they were not debtors in bankruptcy.

As in the case of the earlier contention that the Debtors were impaired from effecting a rescission post-petition, this contention of the Creditor has been consistently implicitly rejected by our past decisions, where we held that lenders whose loans had been rescinded were relegated to the status of holders of only unsecured claims against the respective borrower-debtors.

See Jones, supra, 79 B.R. at 241; *Melvin, supra,* 75 B.R. at 960; and *Tucker, supra,* 74 B.R. at 933. This issue has been, to our knowledge, addressed at length in only one reported decision, *Piercy, supra,* 18 B.R. at 1007-08. There, the creditor's remaining, unsecured claim was faced with not just reclassification as an unsecured claim and reduction in amount, but total elimination, because the debtor had obtained a discharge which would embrace the obligation of the lender whose loan was rescinded. Nevertheless the court held that the equities of allowing rescission "lie in the debtors' favor." *Id.* at 1007. Otherwise, it reasoned, the creditor would "escape the consequences of a serious TILA violation, while at the same time negating the fresh start given the debtors upon their discharge." *Id.* at 1007-08. Here, the Creditor has committed two, independent material violations of the TILA, either of which would justify a rescission. We thus have no hesitancy following the reasoning of *Piercy* and the result of *Jones, Melvin,* and *Tucker* on these facts.

■ Therefore, we will allow the Debtors to rescind despite the fact that this relegates the Creditor's claim to unsecured, possibly uncollectible status. We will not grant the Creditor any sort of priority by requiring the Debtors to pay its remaining unsecured claim any differently from any other of their unsecured claims.

*7. The Debtors are entitled to the full panoply of the relief that they seek, including satisfaction of the mortgage taken against their residence by the Creditor; reclassification of its claim to unsecured status, reduced in amount by a $1,000.00 statutory recoupment penalty; a separate $1,000.00 statutory penalty against the Creditor for refusing to properly respond to the Debtors' valid re-*

scission; and an award of reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1640(a)(3).

The consequences of a valid rescission of this transaction by the Debtors, in light of the failure of the Creditor to properly respond to the Debtors' demand for rescission are, as we described in our prior analogous decisions, quite severe. *See Gurst, supra,* 79 B.R. at 978-81; *Jones, supra,* 79 B.R. at 241; *Melvin, supra,* 75 B.R. at 957-58, 960; and *Tucker, supra,* 74 B.R. at 932-34.

First, the Creditor's mortgage, being invalid, must be marked satisfied by the Creditor. This reduces the Creditor's claim to unsecured status.

Secondly, the Creditor's claim against the Debtors is reduced to, at most, the net proceeds received by the Debtors, less their payments, less a $1,000.00 recoupment penalty. We thus agree with the formula utilized by the Debtors in their calculation of the figure due to the Creditor.[1] However, this yields a sum of $2,426.10 by our calculation, not $2,427.01, as the Debtors suggest. We again emphasize that we do not eliminate the balance entirely, because the Debtors have not requested such relief, as in *Tucker,* 74 B.R. at 933. *But see Gurst,* 79 B.R. at 979.

Thirdly, the Debtors are entitled to a separate statutory penalty of $1,000.00 for the Creditor's violation of the TILA, discrete from its violations in writing the transaction in July, 1985, as a result of the Creditor's improper refusal to honor the Debtors' valid rescission of the transaction. This sum will be ordered to be paid to the Standing Chapter 13 Trustee, Edward Sparkman, Esquire, to determine whether it can be remitted to the Debtors as part of their exemptions or distributed to creditors.

---

1. The net loan proceeds were, as the Debtors contend, $5,197.00. We count only the money received by the Debtors, and not the other charges, such as insurance charges, fees paid in connection with taking the security in the Debtors' realty, and the fee to M & S because § 1635(b) specifically provides that a rescinding borrower is "not liable for any finance *or other charge, ...*" (emphasis added). The payments, per Mr. Leone's testimony, were $1,770.90, not

$1,770.91, as the Debtors suggest. The Debtors also made an error in subtraction.

We note that the only Proof of Claim actually filed by the Creditor was for $2,292.00. However, this was clearly a recitation of only the "reinstatement amount," or arrears, on the claim. Our calculations required us to determine the entire amount due to the Creditor on this loan.

Finally, reasonable attorney's fees, based on 15 U.S.C. § 1640(a)(3), must be awarded to the Debtors' counsel. As in past cases, we urge the parties to attempt to amicably resolve this issue.

*8. The Creditor is not entitled to relief from the automatic stay, pursuant to 11 U.S.C. § 362(d), in light of the fact that its claim has been determined to be unsecured and the mortgage on which it would base a foreclosure proceeding must be satisfied.*

In its motion pursuant to 11 U.S.C. § 362(d), the Creditor sought relief from the automatic stay to foreclose on its mortgage against the Debtors. The disposition of this adversary proceeding renders the mortgage invalid and reduces the Creditor's status to that of an unsecured creditor. Thus, as in *Gurst*, 79 B.R. at 980, the Creditor's § 362(d) motion must be denied.

An Order consistent with the conclusions recited herein will be entered.

### ORDER

AND NOW, this 29th day of August, 1988, after a consolidated trial of July 13, 1988, on the Motion of Equitable National Bank (hereinafter referred to as "Equitable") for relief from the automatic stay in the main case and on this adversary proceeding, and upon consideration of the Briefs submitted by the parties, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Plaintiff–Debtors, JOHN R. CELONA, JR. and MARION M. CELONA, and against the Defendant, EQUITABLE NATIONAL BANK, (hereinafter referred to as "the Creditor") on all of the claims set forth in Adversary No. 88–0437S, as described in the foregoing Opinion and the subsequent paragraphs of this Order.

2. The Claim of the Creditor against the Debtors is reduced to an unsecured claim in the amount of $2,426.10.

3. The Creditor is directed to satisfy the mortgage which it has taken against the Debtors' residential real estate at 2607 Bonaffon Street, Philadelphia, Pennsylvania 19142, within fifteen (15) days from the date of this Order.

4. The Creditor shall pay the sum of $1,000.00 to the Standing Chapter 13 Trustee, Edward Sparkman, Esquire, as damages pursuant to 15 U.S.C. § 1640(a)(2)(A)(i). The said Trustee shall determine whether this sum may be claimed as part of the Debtors' exemptions, and, if it may be, he shall forward this sum to the Debtors forthwith.

5. The parties are urged to attempt to agree upon reasonable attorney's fees and costs which are due to the Debtors' counsel, per 15 U.S.C. § 1640(a)(3). If this matter is not resolved within fifteen (15) days, the Debtors' counsel shall, within thirty (30) days of this Order, file a Motion requesting such fees, said Motion to be procedurally in conformity with *In re Meade Land and Development Co., Inc.*, 527 F.2d 280 (3d Cir.1975); and *In re Mayflower Associates*, 78 B.R. 41 (Bankr.E.D.Pa.1987). However, if the Debtors' counsel remit a reasonable request for such fees, which if refused, the said Counsel may recover compensation for time spend on the fee application as well.

6. In light of this disposition, the Creditor's Motion for relief from the automatic stay in the Debtors' main bankruptcy case, pursuant to 11 U.S.C. § 362(d), is DENIED.

7. The Deputy in Charge of Bankruptcy Operations is directed to enter copies of this Order into the files and onto the dockets of both the main case and the above adversary proceeding.